## North *versus* Phillips.

1. Transactions in stocks by way of margins, settlement of differences and payment of the gain or loss, without any intention to deliver the stocks, are mere wagers.

2. The rule of damages as stated in Bank *v.* Reese, 2 Casey 143, does not apply to ordinary stock contracts, but only to trusts and cases where justice could not be reached by the usual measure of damages.

3. Where parties in such transactions, stand in *equali jure* and there is no fraud shown, the rule governing damages is the same as in contracts in any other marketable commodity, that is the market value of the stock on the day it should have been delivered with interest. Huntingdon and Broad Top Railroad Co. *v.* English, 5 Norris 247, followed.

February 26th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Error to the Court of Common Pleas, No. 1, of *Philadelphia county :* Of July Term 1877, No. 36.

Assumpsit by James R. Phillips against George H. North and William F. North, trading as George H. North & Co.

The defendants were brokers in the city of Philadelphia. In March 1872 plaintiff gave them an order for three hundred shares of Pennsylvania Railroad stock, to be purchased on a buyer's option of thirty or sixty days. The contract was that North & Co. should buy the stock on margin, Phillips to deposit with them ten per cent. of the par value of the stock to protect them against a fall, and at any time that this margin of ten per cent. should be reduced by a decline in the market, Phillips was to make up the difference in the margin; otherwise the defendants were privileged to sell the stock.

Purchases were made in pursuance of these contracts, and in May 1872 defendants were carrying fifteen hundred shares of the stock for plaintiff. The market declined, and North & Co. continually notified Phillips that more margin was required, but he was always behind with the ten per cent. margin, as required by the contract. On the 18th of September 1872, the defendants furnished plaintiff with an account, wherein it was shown he was largely in debt for margins, and defendants threatened to sell him out, if additional margin was not furnished. A temporary arrangement was made, and a portion of the stock was sold with Phillips's consent. The defendants, however, continued to carry for him one thousand shares of the stock, and as the market was still declining, renewed their requests for margins, and their threats to sell, if they were not furnished.

Monday, November 11th 1872, was the day after the great Boston fire. A panic was expected in the stock market. In consequence of Monday being the day fixed for the funeral of General Meade, the Board of Brokers had adjourned over from Saturday until Tuesday. A special meeting of the board was called for

[North v. Phillips.]

Monday, which was opened at ten o'clock that morning. North & Co. sent to the office of Phillips, which was the only address they had or could find, to notify him of the condition of the market. His office was closed, and as he could not be found, his stock was sold.

The plaintiff testified that he called at the office of defendants the morning after the sale, and saw Mr. George H. North. "I said to Mr. North I had received notice of the sale of my one thousand shares Pennsylvania Railroad stock. What does it mean? He replied that he was called on, or something of that kind. Then I asked him why he didn't notify me; why he didn't call on me? I think he made no response to that. Then I told him that I would not accept the sale. Then Mr. North called a friend, standing outside the office, to the office door, and asked him, the friend, if he would know me (pointing to me). He said that he would, or that he did. Then Mr. North pulled out his watch and said, 'I call on you for $5000 margin in five minutes,' or he would sell my stock. Then I said to him, 'You notified me that you had sold the stock,' and then I told him that I would hold him responsible for the stock he held of mine, and I think something to the effect that I would not be swindled out of any more money in that way, and left the office."

George H. North testified. "We went into the back office, and Phillips wanted to know by what authority I sold the one thousand shares Pennsylvania Railroad. I told him that I had notified him the day before in the morning, and before I had sold the stock, by one of my clerks, to come to my office at once to deposit further margins, or to deposit margin, and my clerk reported that he was not at his office or counting-house, or whatever you call it. I then called Mr. Murphy, who was in the front office, and I asked him whether he would know this gentleman again, and after Murphy replying that he would know Mr. Phillips, I tendered Mr. Phillips's one thousand shares Pennsylvania Railroad stock, and gave him till three o'clock to pay for them. That was the end of the conversation. He made no reply to that, and left the office. I recollect taking out my watch when I made this remark, giving him until three o'clock to pay for them. The word 'call' was not made use of by Mr. Phillips. He did not call on me for any stock."

On cross-examination, Phillips, in substance, testified: Gave them $500 for this investment—the purchase of three hundred shares of stock. A corresponding amount in proportion to the number of shares bought was deposited when the other shares were bought. Presume these amounts might be termed margins, but ordered the stock to be bought; expected to make money on the rise in the stock; presumed the balance of the purchase-money was to come from myself, but never paid it; stock was carried for him by his paying $\frac{1}{4}$ and $\frac{1}{8}$ shaves, according to the market;

[North *v.* Phillips.]

had dealt with other brokers in a like manner; stock was never transferred; never asked to have it transferred.

The testimony was very conflicting. The value of the stock carried for Phillips varied from $20,000 to $78,000.

The defendant's sixth and seventh points were as follows:

6. That the measure of damages, if the plaintiff be entitled to recover damages, is the difference between the price at which stock was sold and the price at which his principal could have replaced it within a reasonable time after the notice of sale.

7. That the sale of stock by a broker or agent, where the dealings were in differences, will only entitle the injured party to demand the return of the stock, or if the party fail or refuse to make return thereof, then, within a reasonable time, to replace it himself, and recover, if entitled so to do at all, the differences in value.

To which the court, Allison, P. J., answered:

"If you find this is a contract for the purchase and sale of stock, then I instruct you, upon the law of Pennsylvania, as very clearly settled in the case of Bank of Montgomery *v.* Reese, that the true measure of damages is the difference between the value of the stock on the day it was sold and the highest value that it reaches up to the day of trial."

In the general charge the court, inter alia, said:

"The plaintiff alleges that when called upon, from time to time, he made deposits as what he called margins. When asked upon what terms this stock was bought, he said, in one portion of his evidence: ' I bought this stock for an investment, just as I would buy anything else, with the expectation of making money by the rise of the stock.' When, on cross-examination, he was asked if he did not buy this stock upon what is technically called margins, he said: ' I bought it with the expectation of making money by the rise; I suppose you can call it buying on margins.' When brought back to state exactly upon what terms he dealt with the defendants, he said: ' I bought the stock, and I expected to pay for the stock at its maturity.' This is important, because this case may turn very much upon what you, the jury, may find this to have been—whether it was a purchase by the defendants, acting as brokers or agents for the plaintiff, or whether it was a mere gambling on the part of plaintiff and the defendants that they would hold stock and agree to carry stock for him, he to pay nothing more than the call for margin, and not to be called upon at any time to pay for this stock when they should demand the payment at his hands.

"This is important, because the distinction is a very difficult one to draw so as to bring it to the comprehension of those who are not familiar with these transactions. Yet, still it is a substantial difference in our law, and the Supreme Court of Pennsylvania have

[North v. Phillips.]

had this question before them. It is decided in a very recent case, reported in 22 P. F. Smith. The question was there whether it was an agreement to purchase—that is, the custom or purchased stock—and whether he should, upon complying with the terms of the purchase, be entitled to have that stock delivered to him, or whether it was only an agreement that he should not risk anything more than the margin he had paid from time to time. In the first place, although it may be bought upon time, it may be a bargain for an option. If it is a bargain by which the right of property in a stock vests in a customer, so that he would be entitled to call upon the seller to deliver the stock, that, in law, is a good contract. But if it was nothing more than an agreement that stock was to be carried for him by other parties, who did not part with the title, and did not agree to sell the stock and vest the title in him, so that he was simply to take the chances of making money or losing money by the rise or fall of the stock, the law says it would be an invalid contract. In the case of Kirkpatrick v. Bonsall this distinction is endeavored to be set up by Chief Justice AGNEW. We cannot call this, on the face of it, a gambling contract, so I say to you that a bargain for an option, if this was that kind of a contract, may be a legitimate and perfectly fair and proper business transaction."

The verdict was for plaintiff for $4000. The defendants took this writ and assigned for error, inter alia, the answers to the foregoing points, and submission to the jury of the question whether this was or was not a gambling contract.

*S. Edwin Megargee, James .W. Latta* and *Chapman Biddle*, for plaintiffs in error.—This was a gambling contract, and this court will not enforce it: Kirkpatrick v. Bonsall, 22 P. F. Smith 155; Maxton v. Gheen, 25 Id. 168.

The rule of damages laid down in Bank v. Reese, 2 Casey 143, applies only where there is a relation of trust: Wilson v. Whitaker, 13 Wright 115; Neiler v. Kelly, 19 P. F. Smith 409; McHose v. Fulmer, 23 Id. 367; Huntingdon and Broad Top Railroad Co. v. English, 5 Norris 247; Wagner v. Peterson, 2 Id. 241; Greenway v. Wilkinson, 1 C. & P. 625; Cortilyou v. Lansing, 2 Caines Cas. 216; Hart v. Ten Eyck, 2 Johns. Ch. 117; West v. Wentworth, 3 Cowen 32; Clark v. Painey, 7 Id. 596; Baker v. Drake, 53 N. Y. 211.

To apply the rule of the highest price to a case, like the one at bar, would be fraught with injustice to the defendants. Phillips has risked little or nothing. If, as he says, he was an intended bona fide purchaser, he still had the price of the stocks, less the trifling sum he had advanced for margins. If there had been a tender of the purchase-money, the one thousand shares of Pennsylvania stock would have been immediately delivered to Phillips.

[North *v.* Phillips.]

Musgrave *v.* Beckendorff, 3 P. F. Smith 310, was an agreement for the return of the *identical* bonds loaned, and is distinguished and discussed in Huntingdon Railroad *v.* English, *supra.* Reitenbaugh *v.* Ludwick, 7 Casey 132, was the case of a trust.

*R. D. Maxwell* and *W. S. Price*, for defendant in error.—Whether or not this was a gambling contract was a question for the jury, and under a full instruction from the court they determined it. The measure of damages adopted by the court below, upon the authority of Bank of Montgomery *v.* Reese, 2 Casey 143, should be affirmed by this court. Neiler *v.* Kelly, 19 P. F. Smith 403, decides that when there is a duty on a party to deliver stocks or securities at a particular time, which duty has not been fulfilled, he is liable for the highest price in the market between that time and the trial. It is submitted that the rule is the same when the party has, by a wrongful disposition of the stock, put it out of his power to deliver it at the appointed time.

The same measure of damages was applied to a breach of a contract to replace borrowed stock, in Musgrave *v.* Beckendorff, *supra.* A party liable to account for stocks, is chargeable with the highest market price on his refusal to account: Reitenbaugh *v.* Ludwick, *supra.*[1]

Mr. Justice Gordon delivered the opinion of the court, May 7th 1879.

Says the learned judge of the court below, in his charge to the jury: "If you find that this is a contract for the purchase and sale of stock, then, I instruct you, upon the law of Pennsylvania, as very clearly settled in the case of the Bank of Montgomery *v.* Reese, that the true measure of damages is the difference between the value of the stock on the day it was sold and the highest value that it reaches up to the day of trial." No longer ago than the 4th day of March 1878, in the case of the Huntingdon and Broad Top Railroad *v.* English, 5 Norris 247, this court, without dissent, ruled that the rule of damages as stated in the Bank *v.* Reese, 2 Casey 143, did not apply to ordinary stock contracts, but only to trusts and cases where justice could not be reached by the ordinary measure of damages.

Where parties, as in the present case, stand in *equali jure* there cannot be two different rules of compensation for the breach of a contract, one for the buyer and another for the seller. Were North & Co. suing on a breach of the alleged contract by Phillips, their damages would be measured by the market price of the stock, on the day fixed for its delivery, as compared with the contract price. If we reverse the parties the same rule applies; if North & Co.

---

[1] See Fareira *v.* Gabell, *ante*, p. 89.—Rep.

[North *v.* Phillips.]

refused to execute the contract, then Phillips was entitled to the difference in the prices as above stated, but nothing more, unless fraud was practised upon him, and then his damages might be exemplary. In fine, the rule governing damages in contracts for stock is the same as that in contracts for any other marketable commodity.

Without special notice of the remaining assignments of error, we pass to an examination of the character of the contract, or contracts, between these parties. It would seem, from the statement of the counsel for the plaintiff below, that the defendants were to carry for him four hundred shares of the stock of the Pennsylvania Railroad Company until the 11th of November 1872, and six hundred of the same shares until the 14th of the same month. He complains that they "slaughtered" these shares, on the morning of the eleventh of November; that is, if we understand the term, sold them before the time for which they had agreed to carry them had expired. Hence arises his claim for damages.

Phillips, himself, says: "On receiving that note" (the one informing him of the sale) "I went to the office of Messrs. North & Co. on the morning of the 11th of November 1872. I saw Mr. George North. I said to Mr. North I had received notice of the sale of my one thousand shares of Pennsylvania Railroad stock; what does it mean? He replied he was called on, or something of the kind. Then I asked him why he did not notify me. I think he made no response to that. Then I told him I would not accept the sale. * * * Then North, pulling out his watch, said, 'I call on you for $5000 margin, in five minutes,' or he would sell my stock. Then I said to him, 'You notified me you had sold the stock;' then I told him I would hold him responsible for the stock he held of mine." So the matter rested until the bringing of this suit.

From the above testimony, one would naturally conclude, that Phillips was the actual owner of one thousand shares of stock which his brokers had, without authority, disposed of. But there was nothing of the kind. These stock shares belonged to the defendants. Phillips neither had paid for, nor intended to pay for any of them. They were worth at this time some $52,000, and Phillips himself being judge, was not worth half that amount. According to the statement, above referred to, North & Co. were only to carry them for him for a certain length of time, for a consideration, technically called a "shave." In other words, they agreed to hold this stock in his name, for thirty or sixty days, as the case might be, in order that he might have the advantage of any rise in price that might happen in the meantime, it being also understood, that he must make good any fall in such price. Thus, the dealings of the parties were in "differences" and "margins," and the purchase and sale of the stock was a mere pretence. Hence it was, that when North was challenged about the disposition of these stocks, he

[North *v.* Phillips.]

made no demand for their price but for margin. So Phillips, on the other hand, never pretends that he paid for any of the shares, which the defendants, from time to time, professed to sell to him, but he says, " I settled margins, from time to time, as they called for them by their notes; that is, notifications of Messrs. North." Now, as is said in Maxton *v.* Gheen, 25 P. F. Smith 168, transactions in stocks, by way of margins, settlement of differences and payment of the gain or loss, without any intention to deliver the stocks, are mere wagers. Nothing, however, could better describe the transaction in hand than the above language. It is conceded that an optional contract may be valid and binding upon the parties to it, as in the case of Kirkpatrick *v.* Bonsal, 22 P. F. Smith 125, where the agreement was to deliver oil, within a given time, buyer's option and at a fixed price, but there was nothing in the transaction which indicated an intent to gamble on the fluctuation of prices. Had any such intent been apparent, the result would have been different, for the doctrine above stated, is in that case, emphatically recognised and approved. In the case in hand, however, the very proofs adduced by the plaintiff to establish his several contracts with the defendants, reveals the fact that they were mere gambling devices, such as the courts will not help the parties to enforce.

Judgment reversed.