## Dickson's Executor *versus* Thomas.

A. directed B., a stock broker, to sell on his account five hundred shares of stock "short." It did not appear whether A. owned the stock or not. He gave no certificate to B., and arranged with him that there was to be no actual delivery of the stock between them, but that A. was to protect B. from loss if the market value of the stock advanced, and receive the difference in value from B. if it declined. There was no agreement that B. should not make actual delivery of the stock he was instructed to sell. B. sold accordingly, and afterwards the price rose. B. then borrowed from a fellow broker the necessary certificates to make delivery, and did deliver them and receive payment therefor through his clearing-house sheet. The price still rising, B. subsequently bought on A.'s order five hundred like shares to make good his loan, receiving them and paying for them also through his clearing-house sheet. He paid also to the lender the amount of an intermediate dividend on the stock. In an action by B. against A. to recover the amount expended for A.'s use in those transactions: *Held*, that the facts disclosed stamped the transaction as a mere gambling contract between the plaintiff and the defendant, which was contrary to the policy of the law, and that therefore the former was not entitled to recover.

February 24th 1881. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Error to the Court of Common Pleas No. 4, of *Philadelphia county*: Of January Term 1881, No. 108.

Assumpsit, by John J. Thomas against John B. Dickson, to recover the amount alleged by plaintiff to have been laid out by him in a certain transaction in stocks entered into by defendant's order. The first trial of the cause resulted in a verdict for plaintiff, but a new trial was granted, the parties agreeing, in view of defendant's approaching death, that plaintiff should be permitted to testify on the new trial, and that defendant's deposition should be read. Subsequently defendant died, and his administrator was substituted in his place.

[Dickson's Ex'r *v.* Thomas.]

On the second trial, before Briggs, J., plaintiff was first called to the stand. He testified that he was a member of the Philadelphia Board of Brokers, and a personal friend of the defendant Dickson; that on June 17th 1874, he received from defendant, in the reading room of the Philadelphia Club, a verbal order to sell short on his account five hundred shares of stock in the Pennsylvania Railroad Company. That he did accordingly, in pursuance of this order, sell, at the Board of Brokers the next day, June 18th 1874, four hundred shares of the stock at $48\frac{7}{8}$, and one hundred dred shares at $49, seller's option, fifteen days. That at the expiration of fifteen days he delivered the stock and received the money for it; that in order to effect this delivery he had borrowed the certificates from another party. That the price rising, he had, on November 6th 1874, in order to make good the borrowed shares bought at the board on defendant's order five hundred shares of the stock at $52\frac{5}{8}$. That in addition to the difference between the amount paid for these and the amount received from the sale of the former shares to which extent he was out of pocket, he had been obliged to pay to the lender of the shares delivered $1250, being the amount of a dividend declared in the meantime upon them; and further, that while this transaction was running he had had frequent conversations with defendant, asking him sometimes for margins, which defendant, however, failed to deposit. On cross-examination plaintiff explained that he had not given and received checks for the shares of stock bought and sold by him, but that he had paid and received the purchase-money through his clearing-house sheet. The cross-examination then proceeded, inter alia, as follows:

Q. Did Mr. Dickson give you a certificate of stock to sell?

A. No, sir.

Q. Do you not know that he had no such certificate?

A. Well, I do not know whether he had or not.

Q. At the time you sold that stock, had you five hundred shares of that stock to sell, in your own hands, and a certificate for it?

A. No, sir.

Q. When you sold it, did you deliver five hundred shares of it to anybody?

A. Yes, sir

Q. How?

A. When the fifteen days were up, I delivered the five hundred shares on the clearing-house sheet.

Q. Through the clearing-house?

A. Yes, sir.

Q. And not actually yourself?

A. That is delivery.

Q. But that is not what I mean. I mean your personal deliv-

ery.   You did not take a certificate for five hundred shares of Pennsylvania Railroad stock and hand it to anybody, did you?

A.  No.

Q.  Did you not, on the former trial, swear "I delivered these shares of stock through the clearing-house sheet?"

A.  Yes, sir.

Q.  "Which we have in the board?"

A.  Yes, sir.

Q.  Did not you also swear that "the clearing-house sheet is the way we have of delivering stock in the board?"

A.  Yes, sir.

Q.  Did not you say that you pay in your difference, or receive it, each day, according to your account, as standing?

A.  Yes, sir.

Q.  Did not you also say, "we only pay the differences, or receive the difference?"

A.  Yes, sir.

Q.  And "I did not actually deliver the stock?"

A.  I do not think I said that.

Q.  "We do not actually deliver the stock;" did not you say that?

A.  I do not remember whether I did or not.

Q.  Did not you also say, in point of fact, that there was no actual delivery of the five hundred shares in June 1874?

A.  No, sir; I do not think I did.

Q.  Did not you say, "I had no certificate, and the only delivery was the settlement for the difference?"

A.  I had to have the certificates; I had to borrow them from other people.

Q.  Did not you say, upon the former trial, that "I had no certificate, and the only delivery is a settlement for the differences?"

A.  I do not remember that I did.

Q.  When the stock was loaned to you, the five hundred shares, did the person who loaned you those shares actually hand you a certificate for five hundred shares?

A.  No, sir; it came in on the clearing-house sheet.

Q.  He did not deliver it to you, but it came through the clearing-house sheet?

A.  Yes, sir.

Q.  And there was no actual delivery to you?

A.  No actual delivery to me.

Q.  And you could not tell where it went, could you; or to whom it went?

A.  No, sir; not at the end of the day, through the clearing-house.

Q.  You say that you never saw, or actually delivered any cer tificate yourself?

[Dickson's Ex'r *v.* Thomas.]

A. Yes, sir; I did actually deliver it, because I delivered it on the clearing-house sheet.

Q. No, no; I mean you never delivered it yourself, personally?

A. Do you mean that I took five hundred shares and delivered it to a man myself, personally?

Q. Yes, sir; that is what I mean to say.

A. No, sir.

Q. Did not you, upon a former trial in this case, say, and have not you said it twice, "We only pay the difference or receive the difference; we do not actually deliver the stock?"

A. That is, for our clearing-house certificate balances: we only pay the difference, or receive the difference. If we have something coming in on one side, that is going out on the other, of course, we merely pay the difference.

Q. Did you act as a broker for Mr. Dickson in that sense?

A. Did I act as a broker? Yes, sir.

Q. When you and the defendant, Mr. Dickson, had this understanding, as you have explained it, was it not understood by you and the defendant that there would be no actual delivery of the stock by you to him, or by him to you, but that he was to receive the difference from you in case the price of stock went down, or was to pay the difference to you in case the price went up?

A. Yes, sir.

Q. That is, if there was any loss he was to pay?

A. Yes, sir.

Q. And if there was any profit, you were to hand it over to him?

A. Yes, sir.

On re-examination the plaintiff testified, inter alia, as follows:—

Q. Mr. Brewster asked you just now, whether at the time you made your contract with Mr. Dickson, there was an agreement between you and him that there would be no delivery of stock, but he was to be responsible to you for the loss, and you were to be responsible to him for the gain. That is what I want to understand.

A. There was nothing of that kind said.

On re-cross-examination plaintiff testified, inter alia, as follows:—

Q. You have said that there was nothing of that kind at all. Have not you testified that at the time Mr. Dickson directed you to sell the stock, it was understood between you and him that there was to be no actual delivery of the stock by you to him, or by him to you, but that he was to protect you from loss if the stock went up, and that he was to receive the difference from you in final settlement if the stock went down; did you not say that?

A. That certainly was the understanding.

Plaintiff then identified by his clerk his purchase and sales book,

[*Dickson's Ex'r v. Thomas.*]

such as stock orders usually keep in which were contained entries of the foregoing transactions. The correctness of these entries was testified to by the clerk, and the book was then offered in evidence. Objected to by defendant because not a book of original entry. Objection overruled. Evidence admitted for the purpose of showing the sale, but not delivery. Exception. Plaintiff then closed.

Defendant then read the deposition of John B. Dickson, deceased, denying that he had authorized plaintiff to buy or sell any stock on his account.

Defendant requested the court to instruct the jury as follows:—

1. "The evidence of the plaintiff, showing as it does, that he acted as the agent of the defendant in the transaction sued on, and that the understanding between them was that there was to be no delivery of the stock sold, but merely a settlement of differences, there can be no recovery in this suit, and your verdict must be for the defendant." Refused.

2. "Under the evidence, your verdict must be for the defendant." Refused.

The court charged, inter alia, as follows: "The book may be given in evidence for the purpose of showing the time of sale, but the time of delivery cannot be shown by the book; Mr. Thomas testifying about the time when the stock was delivered, and the manner of its delivery. He settled according to the sheets rendered by the clearing-house, which is an institution established by the board of brokers for their own convenience. If the settlement was made and ratified; I say ratified [if it was ratified by the plaintiff by practical performance in accordance with the rules and regulations established by the clearing-house, of which he was a member, then the delivery is just as effectual as though the stock had been delivered in bulk, or the certificates had been received, and they handed over]. Where there are open accounts between the parties, to strike the difference, and to settle according as that difference may be one way or the other, is a legal settlement to all intents and purposes, as effectually as if one party would pay a given sum, accordingly as the account would be found on one side, and then the other party would pay as the account appears on the other side; instead of going through all this circuity the parties may take the results, and strike a balance in figures, and settle accordingly.

["Therefore, if you find in this case, that this sale was made in good faith, and the delivery made by the plaintiff in accordance with clearing-house regulations, you may assume that the deliveries were according to law. Mr. Thomas has laid before you his book, containing this entry. You may look at it, to discover whether it appears in its regular place, according to fair journalizing, as it appears upon the book; whether it is sandwiched or interlined; whether it appears on that day with other transactions; whether

[Dickson's Ex'r *v.* Thomas.]

the date corresponds; whether it bears the impress of fairness and regularity. * * * Here are the books of original entries, and here are the various statements made by him. Are they true or are they false?] * * *

"The case is open fairly and squarely for you to determine according to the evidence. If you believe Mr. Dickson that is an end of the case, and Mr. Thomas has no case whatever, and the verdict should be for the defendant. If you believe Mr. Thomas, then, unless the transaction is what the law calls a wagering or gambling transaction, Mr. Thomas would be entitled to recover, for the defendant has placed his defence upon two grounds through his counsel; first, the contract was never made, and, second, if you should find from the evidence that it was made, it was made illegally, and was a gambling transaction.

"Now, unless you pass the first point of the defendant, namely, that Mr. Dickson never entered into the contract, and if you believe he never did, you need *not inquire further, and indeed you should stop there and render a verdict for the defendant.* If, however, you pass that point by believing that a contract was entered into, then you will inquire whether the contract was a wager, or one of a gambling nature, and if you do find that it was such, then you will render a verdict for the defendant, for the law does not open the doors of its tribunals to aid gamblers. Whatever form, whatever guise, the transaction may assume is of no consequence. If it is a gambling transaction, then the parties must settle all such transactions outside of the tribunals of justice, because those transactions are opposed to the law of the land, and we do not open these tribunals to hear litigation, or give attention to parties whose contentions and disputations are based on illegalities. The courts of justice are only opened to legal questions.

"With reference to the latter point, I say that a sale of stock on time, made in good faith, with intent to deliver it whether the seller has the stock in his possession or not is a legal sale. Understand me. I repeat: A sale of stock or merchandise of any kind, on time, whether the seller has it on hand or not, if made in good faith, and with the intention of delivery, is a legal transaction, and may be enforced in a court of justice.

["Therefore, in considering this latter point of defence set up, if you find that Mr. Dickson authorized Mr. Thomas to sell this stock for his account, seller's option, fifteen, without informing him that it was to be settled for in differences, and without informing him that it was merely a matter of gambling speculation, the plaintiff may recover. If, however, he communicated to him at the time, or it was known to him at the time, and if the evidence satisfies you that Mr. Thomas knew it was a stock-gambling operation, that no stock was to be delivered to him, but the whole transaction at the end of the time, or whenever it was closed was to be settled in

differences, it not being indicated at the time that any stock was to be delivered by him, or any stock was to be delivered by the broker. who made this short sale, then it is what the law stamps as a gambling transaction, and the defendant would be entitled to your verdict.]

" This is the law of this case. There was a distinction supposed by my brother, Judge THAYER, the president of this court, that where the party was simply the agent or broker, and even if he knew that the transaction was one of a gambling character or nature, yet, if he advanced the money for the principal, he might, notwithstanding, recover. [That was his view at the time; and I am not sure that, after all, it will not be declared to be the law, for the case that went to the Supreme Court was very obscure.] It was the thought of the profession up to that time; and it is still the law of England from which we draw the purest law that is administered in this country. They study the analogies, and they study the propositions of law; and they are so learned, and so able, that we do honor to ourselves by taking their precedents, because they are so well considered that it would create a wonderful vacuum if we would reject the adjudication of tribunals as high and as learned as those. When we refer to them as the English law, we refer simply to the source from which we can safely draw our precedents. They take our own, and they have taken, in one respect, the entire Pennsylvania code; and they have done us that honor with regard to the reforms that have been established with reference to equity proceedings.

" I say, at the time that this case was tried before, the learned president of the court was under the impression that there might be a recovery, if Mr. Thomas was acting in the capacity of agent, and advanced his money for the account of the principal; but soon after that time, and before Judge THAYER had disposed of a motion for a new trial—I refer to this because the learned counsel have repeated it in your presence to you over and over again, and because you have been told that this is the fourth time that this case has been before this court, and, therefore, I refer to this fact conceded by the respective counsel, who have addressed you—and while the motion for a new trial was still pending, the Supreme Court passed upon a case of a similar nature and made this decision. And, gentlemen, we are always bound to take the decisions of the Supreme Court. I take its decision personally and judicially, and swallow it without a grimace or question. I do not pretend to say that that tribunal is wrong, as some judges seem to think. I believe they are not wrong; and I have no fault to find with them. There must be a point where all contentions and controversies shall be settled and determined, for public peace and public policy demand it; and that is the place for such determination. However, I take their decisions whether right or wrong, although the pre-

sumption is that they are right; and in this case to which I have referred, and which they decided while a motion for a new trial was pending in this particular issue, they laid down this doctrine: that where, perhaps, one man loans money to another to go into a gambling operation, if he hands the money over to the receiver or operator, and does nothing more, he may recover the money back, because he is not an agent in the transaction; but where the man becomes an active party in executing the illegal transaction, as, for instance, if he advances the money, and plays with it for the account of the lender, and loses it, there he becomes so identified and mixed up with the transaction that he cannot then call upon the party to pay, because he executes the gambling contract. Now, the analogies between that aspect of that case and this are, that Mr. Thomas must have known that this was a gambling venture, because, first, he not only lost his money, but, second, he was the very party to carry into effect this transaction, and he himself was the very party who executed it. Therefore, according to this very decision of the Supreme Court, you must, if you believe this a gambling transaction, find a verdict for the defendant, because Mr. Thomas is directly within its range, and principle, and decision, because he was the man that absolutely executed the alleged gambling transaction, or contract, or venture."

Verdict and judgment for the plaintiff, for the full amount claimed; whereupon defendant took this writ, assigning for error, inter alia, the admission of plaintiff's purchase and sales book in evidence, the refusal of defendant's points, the portions of the charge above cited in brackets, and the tendency of the whole charge to leave an impression on the minds of the jurors that the decisions of the Supreme Court in former cases were doubtful law, and to favor the claim of the plaintiff as a legal contract satisfactorily proved.

*Benjamin Harris Brewster*, for plaintiff in error.—The purchase and sales book should not have been admitted in evidence, because it failed to charge defendant or to show any delivery of the stock: Fairchild *v.* Dennison, 4 Watts 258; Himes *v.* Barnitz, 8 Id. 47; Hale *v.* Ard, 12 Wright 23; Ducoign *v.* Schreppel, 1 Yeates 347; Juniata Bank *v.* Brown, 5 S. & R. 231; Rogers et al. *v.* Old, Id. 404; Murphy *v.* Cress, 2 Whart. 35; Howell *v.* Barden, 3 Dev. (N. C.) 449; Tenbroke *v.* Johnson, 1 Coxe (N. J.) 288.

The delivery of stock through the clearing-house was not a legal bona fide delivery, but merely a settlement of differences, and so the court should have charged. In any event the question whether this constituted bona fide delivery should have been left to the jury. The understanding between the parties being admitted by plaintiff to be that no stock was actually to pass between them, the contract

[Dickson's Ex'r *v.* Thomas.]

was admittedly a gambling contract contrary to the policy of the law, and therefore void: Brua's Appeal, 5 P. F. Smith 294; Smith *v.* Bouvier, 20 Id. 325; Fareira *v.* Gabell, 8 Norris 89.

The tone of the whole charge was grossly unfair to the defendant.

*John O. Bowman* (with whom was *Thomas J. Diehl*), for defendant in error.—The purchase and sales book was properly admitted in evidence. It was put in as evidence of sale, and not of delivery. Nor was it offered as primary and independent proof, but coupled with the testimony of the clerk as a means of refreshing his memory and corroborating his statements: Barnet *v.* Steinbach et al., 1 W. N. C. 335; Henry *v.* Martin, Id. 277; Nichols *v.* Haynes, 28 P. F. Smith 174; Imhoff *v.* Smith, 3 Phila. 381; Fitler *v.* Eyre, 2 Harris 392; Whart. on Ev., sects. 516, 519.

The mere fact of the sale being short did not constitute it *ipso facto* a wagering transaction: Maxton *v.* Gheen, 25 P. F. Smith 168.

[SHARSWOOD, C. J.—Is there any evidence in this case to show that Dickson had the stock which he authorized Thomas to sell?]

No. But Thomas did not know whether he had or not. He may have had it; and the court will not, on account of our failure to prove that he had, presume the contrary.

. The use of the clearing-house, the borrowing the certificates from others, &c., do not constitute actual proofs of a gambling contract •—they are all perfectly consistent with bona fide intent, and should have been submitted to a jury to draw from them what conclusion they deemed warranted as to the true nature of the transaction: Wynkoop *v.* Seal, 14 P. F. Smith 361; Smith *v.* Bouvier, 20 Id. 325.

Mr. Justice GORDON delivered the opinion of the court, March 7th 1881.

An inspection of the evidence of the plaintiff will, of itself, reveal the fact that there was a mistrial of this case in the court below.

Thomas swears that he sold for Dickson five hundred shares of Pennsylvania Railroad stock, short, fifteen days, buyer's option. This means, of course, that Dickson had no such stock, and so Thomas further on explains, by saying that at the time he professed to sell this stock, he had no such stock in his hands to sell. Nevertheless, he says, when he sold these five hundred shares, he delivered them. This anomalous kind of testimony he explains by saying that this delivery was made on the clearing-house sheet, which means a mere settlement of differences. It appears also, from this same testimony, that, in order properly to keep up appearances, when the time came for delivery, he had to borrow five hundred shares of stock from somebody whose name does not

appear, and of these there was no actual delivery, but, as the witness says, it came through the clearing-house sheet. All this means, in common parlance, that Thomas sold for Dickson five hundred shares of stock, which Dickson at that time neither had nor intended to have, and that under the pretence of meeting this contract when it fell due, Thomas pretended to borrow five hundred shares, which were not delivered to him; that this altogether fictitious transaction was accomplished through the agency of the clearing-house, and was one in which no other parties were known but Thomas and Dickson, who were to account to each other for differences only.

In order to show that in this we are not mistaken, and that the confirmation may proceed from the plaintiff's own mouth, we subjoin the following evidence, to wit:

Q. Did not you upon a former trial in this case say, and have you not said it twice, we only pay the difference or receive the difference; we do not actually deliver the stock?

A. That is for our clearing-house certificate balances we only pay the difference or receive the difference. If we have something coming on one side that is going out on the other, of course we merely pay the difference.

Q. Did you act as a broker for Mr. Dickson in that sense?

A. Did I act as broker? Yes, sir.

Q. When you and the defendant, Mr. Dickson, had this understanding as you have explained it, was it not understood by you and the defendant that there would be no actual delivery of the stock by you to him or by him to you, but that he was to receive the difference from you in case the price of stock went down, or was to pay the difference to you in case the price went up?

A. Yes, sir.

Q. That is, if there were any loss he was to pay?

A. Yes, sir.

Q. And if there was any profit you were to hand it over to him?

A. Yes, sir.

Again, further on.

Q. Have not you testified that at the time Mr. Dickson directed you to sell this stock, that it was understood between you and him that there was to be no actual delivery of the stock by you to him, or by him to you, but that he was to protect you from loss if the stock went up, and that he was to receive the difference from you in final settlement, if the stock went down; did you not say that?

A. That certainly was the understanding.

Confessedly, then, this was a dealing in differences or margins, a wagering contract, and therefore utterly void. There was here no question as to a bona fide time contract, upon which the jury

[Dickson's Ex'r *v.* Thomas.]

was called to pass, neither does it involve, as the court below erroneously imagined, the question of agency, for there were but two parties who were mutually engaged in stock jobbing, and who were to settle with each other and not with some third party.

Moreover, we are somewhat surprised that the learned judge who tried this case should have regarded the recent decisions of this court upon this subject as not only novel but doubtful.

We can assure him that they are obnoxious to neither of these charges. As early as Pritchet *v.* Insurance Co. of North America, 3 Yeates 458, it was ruled, that whilst the British Statute of 19 Geo. II., c. 37, did not bind us, *proprio vigore*, yet that that system of national policy which aimed at the suppression of wagering policies, had even at that period been adopted by our courts, and in Edgell *v.* McLaughlin, 6 Whart. 176, it was said by Mr. Justice SERGEANT, that it was fortunate for Pennsylvania that there was in its highest tribunals no decision favorable to the recovery of a wager, and that the only decision then existing upon the subject was expressly in point to the contrary.

Between this case and that of Brua's Appeal, 5 P. F. Smith 294, we have very many decisions condemnatory of wagering contracts in the way of betting on horse races, elections, &c. Brua's Appeal is in point, however, upon the very matter in controversy. It was there held that a contract to purchase shares of stock, without the intention to deliver or receive them, was a gaming contract. Mr. Justice THOMPSON, who delivered the opinion in that case, made use of the following language: " It is said the form in which this contract appears enters largely into the business of stock brokerage. This is a mistake, the bona fide purchase of stocks no doubt can be conducted in a legitimate way, and is so generally, without trenching in the least on the gambler's province. If this be impossible, however, the fewer licenses that are issued for such a business the better. Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another, is gambling, and demoralizing to the community, no matter by what name it may be called."

Then we have Smith *v.* Bouvier, 20 P. F. Smith 325, in which Brua's Appeal is approved, and the distinction noted between bona fide time contracts and those of a purely wagering character. Next in order comes Fareira *v.* Gabell, 8 Norris 89, in which we have a Per Curiam opinion adopting the very clear and satisfactory opinion of Judge HARE of the court below, and approving Smith *v.* Bouvier and Brua's Appeal. Then comes North *v.* Phillips, 8 Norris 250; Gheen, Morgan & Co. *v.* Johnson, 9 Id. 38, and last of all Ruchizky *v.* DeHaven, *ante.*, p. 202.

It is thus manifest, that contrary to what the learned judge supposed, this doctrine is neither doubtful nor new; on the other hand, it is both old and well established.

[Dickson's Ex'r v. Thomas.]

Furthermore, he is entirely mistaken in his supposition that on this subject there is a want of harmony between our courts and those of Great Britain. This very same doctrine was held in Grizewood v. Blane, 11 Com. B. (2 J. Scott) 526, a case which exhibits the ready disposition of the British courts to follow the leadings of their own statute, 8 & 9 Vict., c. 109. Upon this subject, JERVIS, C. J., left the question to the jury to say, "whether either party meant to purchase or sell the shares in question," telling them that if they did not, the contract was, in his opinion, a gambling transaction and void. On a motion afterwards for a new trial, the opinion of the chief justice was sustained. Justice CRESSWELL, among other of the judges, saying: "As to the evidence, I think it abundantly warranted the jury in coming to the conclusion that there was no real contract of sale, but that the whole thing was to be settled by the payment of differences; it clearly was a gambling transaction within the meaning of the statute."

Now the only real difference between this case and the one in hand is this, that in the case cited there was something to submit to a jury, whilst in the one now under consideration, there was nothing so to submit; the plaintiff himself, by his own testimony, having stamped the transaction with the brand of illegality.

Of the remaining exceptions it is unnecessary for us to speak, since what has already been said effectually disposes of this case.

The judgment is reversed.