Dunn, by next friend, *v.* Bell and others.

*(Nashville.* March 10th, 1887.)

1. CONTRACTS. *Dealing in "futures."* *Wagers.* *Recovery of money lost on, by loser's wife.*

Contracts purporting on their face to be contracts of sale or purchase of grain, stocks, or other property to be delivered at a future day, but under which neither of the parties intends to buy or sell real products, but both intend at the time of making the contracts to wager on the rise and fall of the market prices of the products pretended to be bought or sold, and to close the transaction by a settlement of differences in prices merely, are wagering contracts, and illegal and void; and money paid and lost thereon may be recovered by the wife of the loser under § 2441 M. & V. Code.

Code cited: §§ 2438, 2439, 2440 (2441), 5688, 5705 (M. & V.); §§ 1769, 1770, 1771 (1772), 4870, 4883 (T. & S.)

Cases cited and approved: McGrew *v.* City Produce Exchange, *ante,* p. 572; Marshall *v.* Thruston, 3 Lea, 740; Beadles *v.* Owenby, 16 Lea, 424; 110 U. S., 499, 508; 97 Pa., 278; 83 Ill., 33; 52 Wis., 593; 71 N. Y., 420; 114 Mass., 80; 11 C. B., 526; 1 S. W. Rep., 60.

2. SAME. *Wagering on foreign markets.*

A contract which, though purporting to be a sale or purchase of commodities to be delivered at a future day, is, in fact, but a wager on the rise and fall in the market prices of such commodities, is none the less illegal and void because made with reference to prices in foreign markets over which the contracting parties had no control.

3. SAME. *Liability of confederates in gambling transactions.*

Where several persons confederate for an unlawful purpose—*e. g.,* gambling on the rise and fall of the prices of commodities in the markets—all are jointly and severally liable for every transaction done or procured to be done by any of the confederates in pursuance of their common purpose.

Cases cited and approved: McGrew *v.* City Produce Exchange, *ante,* p. 572; State *v.* Smith, 2 Yer., 273; Howlett *v.* State, 3 Yer., 153; 17 Ohio St., 469.

Dunn, by next friend, *v.* Bell and others.

4. SAME.  *Limitation of suit by wife for wager lost by husband.*  Code, ¿ 2441 (M. & V.), construed.

The wife's right of action to recover money lost by the husband on a wager is not barred in ninety days (Code, ¿ 2440, M. & V.), but her suit may be brought "after the expiration of the ninety days, and within twelve months thereafter."  (Code, ¿ 2441, M. & V.)

5. SAME.  *Winnings and losses.  Set-off.  Barred, when.*

In a proceeding by the wife to recover moneys lost by her husband in gambling transactions, any sums received by the husband, as winnings on such transactions, are proper matters of set-off; and the right to plead such set-off attached at the institution of the wife's suit, and no statute of limitation could be operative thereafter against it.

Cases cited and approved :  Williams *v.* Lenoir, 8 Bax., 396; 2 Esp., 569.

---

### FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. A. G. MERRITT, Ch.

ED GANNAWAY and J. P. HELMS for Dunn.

JOHN LELLYETTE, E. T. MORRISS, and · HILL & GRANBERRY, for Bell and others.

CALDWELL, J.  The origin, nature, and result, thus far, of this litigation appears from the report of the Commission of Referees, which is as follows :

TINNON, R.  "This is a case in which the complainant's husband bet and wagered his money with the defendants, in margins, upon the rise or fall in the price of certain commodities in the market at

a future day. The complainant's husband lost his money—$693.70—in these gambling and wagering contracts, and she filed this bill against the defendants who got the money, within twelve months from the date of the transactions, to recover it from them.

" The Chancellor was of opinion and decreed as follows:

"' It further appears to the Court that the defendants made various wagering contracts in "futures" with M. C. Dunn, the husband of the complainant, and that said contracts were purely wagering or betting contracts on the rise or fall of the grain, cotton, or stock markets, without any intention on the part of either party to the contracts to handle or deliver any real article.'

" The Chancellor granted a decree in favor of the complainant against the defendants for the money lost and interest—$749.20. The decree is clearly correct upon the law and the facts of the case, except the set-off of $178.65 claimed by the defendants, which, we think, should have been allowed. The proof shows that the complainant's husband, while he was losing his ' margins,' won that amount from the defendants. The defendants' right to plead the set-off *attached* when the bill was filed against them, and they were not barred by the ninety days' limitation, although their answer, claiming the set-off, was not filed within that time.

"' The bringing of a suit by one party saves from

the operation of the statute all such claims of the defendant as are properly the subject of set-off, and which are in fact pleaded as a set-off in the action.' Wood on Lim., 601; 8 Bax., 396; 2 Esp., 569.

"It is earnestly insisted, however, that the contracts to buy 'futures' in this case are not within the statute authorizing the losing party to recover back the money put up and lost 'on margins.' We think the contracts are, under the proof in this case, within the *letter* as well as within the *evil* intended to be remedied by the statute. The facts are, that when the dealer, M. C. Dunn, concluded upon which side he would put up his margin—whether he would risk it upon the rise or fall of the article named—he signed and delivered to the defendants a written order to buy or sell the article named upon his account, at the price named, to be delivered at a future day specified, and the defendants, at the same time, delivered to him a written contract that they *had bought* or *had sold* the article upon his account, to be *delivered* at a future day named in the contract. The contract then states the amount of the margin put up, and recites conditions upon which it would be lost and the contract closed. The proof is conclusive that the defendants did not buy or sell the articles named in the contract, and that neither party *intended* at any time to buy, sell, deliver, or receive the articles specified, but *intended* simply to settle by the 'difference' in the price of the article in

the market when the contract was made and the price on the day named for delivery. This leaves nothing in the transaction but a 'naked wager' upon the rise or fall of the article in the market. We think the margins put up under these contracts are as clearly wagers as can be conceived, pernicious in the extreme, and void, both by statute and public policy.

"We have heretofore considered the questions involved in these bucket-shop cases, giving the reasons and citing the authorities for our opinion; but, in deference to the earnest and able argument of the defendants' counsel in this case, we will again briefly state the ground of our conclusion.

"The Code, under the general head, 'Void Contracts,' and under the special head, 'Gambling and Wagering Contracts,' provides as follows:

"'2438. All contracts founded, in whole or in part, on a gambling or wagering consideration shall be void to the extent of such consideration.

"'2439. No money or property of any kind won by any species or mode of gaming shall be recovered by action.

"'2440. Moreover, any person who has paid any money, or delivered anything of value, lost upon any game or wager may recover such money, thing, or its value, by action commenced within ninety days from the time of such payment or delivery.'

"'5705. All laws made for the prevention, discouraging, or suppression of gaming shall be construed as remedial and not as penal statutes, and

no presentment or indictment in such case shall be quashed for want of form.'

"Bouvier defines a wager as follows: *Wager*. A bet; a contract by which two parties or more agree that a certain sum of money or other thing shall be paid or delivered to one of them on the happening or not happening of an uncertain event.

' "The whole current of authority now is that contracts just such as these in this record, under the same state of facts, are gambling and wagering contracts, and void, both by statute and public policy. We have no doubt whatever that the Legislature, in enacting the chapter in the Code entitled 'Void Contracts,' intended to declare all contracts and transactions of the character of those in this record 'gambling and wagering contracts,' and intended to empower the losing party, his wife or creditor, to recover the money thus lost from the other party.

"The construction of the penal statute against gaming—Code, § 5688—using the words, 'play at any game of hazard or address,' and the cases defining gaming under that statute, have no application to the questions in this case. The chapter of the Code above recited, over the head of 'Gaming and Wagering Contracts,' was simply intended to provide a remedy for the losing party in all contracts, void as gaming or wagering contracts, to recover back the money thus lost. We will cite some of the cases and authorities which we have considered, and which sustain our conclusion upon

the questions in this case: *Marshall* v. *Thruston*,
3 Lea, 740; *Irwin* v. *Willar*, 110 U. S., 499, 508;
*Dickson* v. *Thomas*, 97 Pa., 278; *Lyon* v. *Culbertson*,
83 Ill., 33; *Barnard* v. *Backhaus*, 52 Wis., 593;
*Story* v. *Solomon*, 71 N. Y., 420; *Love* v. *Harvey*,
114 Mass., 80; Dos Passos on Stock Brokers, 410,
477; 2 Benj. on Sales, 714.

"Mr. Justice Matthews, delivering the opinion of
the Court in *Irwin* v. *Willar*, above cited, says:

"'The generally accepted doctrine in this coun-
try is, as stated by Mr. Benjamin, that a contract
for the sale of goods to be delivered at a future
day is valid, even though the seller has not the
goods, nor any other means of getting them than
to go into the market and buy them; but such a
contract is only valid when the parties really in-
tend and agree that the goods are to be delivered
by the seller and the price to be paid by the
buyer; and if, under the guise of such a contract,
the real intent be merely to speculate in the rise
or fall of prices, and the goods are not to be de-
livered, but one party is to pay the other the dif-
ference between the contract price and the market
price of the goods at the date fixed for executing
the contract, then the whole transaction constitutes
nothing more than a wager, and is null and void.'

"The English statute, 8 and 9 Vict., Ch. 109,
Sec. 18, is similar to ours, using the words: 'Con-
tracts by way of gaming or wagering shall be null
and void,' and the courts there uniformly hold
that contracts like these in this record are within

the statute. *Grizewood* v. *Blane*, 11 C. B., 526, was an action on a contract for the future delivery of railway shares, and Jervis, C. J., left it to the jury to say what was the plaintiff's intention and what was the defendant's intention at the time of making the contracts—'whether either party really meant to purchase or sell the shares in question, telling them if they did not the contract was, in his opinion, a gambling transaction and void.' The ruling was held to be correct.

"But certainly we need not multiply authorities upon the question. The statute is plain, and the evil to be suppressed is rank, and is corrupting the morals of the land.

"The charter of incorporation does not cover these transactions, and the defendants must be held liable individually as confederates in unlawful transactions.

"We recommend that the Chancellor's decree, modified as above indicated, be affirmed, but the complainant should pay the cost of the appeal.

"Caldwell and Eakin, R.'s concur."

The defendants filed five exceptions to the report:

"*First*—Because the Court failed to report that the alleged contracts were made upon the rise and fall of the New York and Chicago markets, and that the defendants or complainant had no control over the said markets."

The report does fail as assumed in this exception; but that is wholly immaterial. That the con-

tracts of the parties were made with reference to markets in other cities, and beyond their control, cannot affect the validity or invalidity of those contracts and the liabilities flowing therefrom.

"*Second*—Because the Court failed to report that the defendant is an incorporated company," etc.

The bill is not filed against "an incorporated company," and no such creature is before the Court as a defendant. Certain individuals are sued as persons "trading under the name of the 'Tennessee Brokerage Association,'" but no effort is made to sue a corporation. The persons sued answer jointly as individuals, making no reference to "an incorporated company." The bill of exceptions recites that it was agreed by counsel "that the charter of the 'Tennessee Brokerage Association' be read as evidence;" but no such charter appears in the transcript. The bill of exceptions paranthetically states: "This charter referred to was never filed."

"*Third*—Because they do not report that said transactions * * * were legitimate, and not gambling or wagering transactions."

The report states the facts of the case correctly with reference to the transactions mentioned therein, and properly applies the law to them. That neither party *intended* to buy or sell *real products*, and that both parties *intended*, at the time of making the several contracts, to close them by a *settlement of differences merely*, is well established by the proof; and the authorities cited sustain the proposition

that such contracts are gambling or wagering, and, therefore, illegal and void. In accord is the late case of *Beadles* v. *Owenby*, 16 Lea, 424; also *Fortenburg* v. *State*, 1 S. W. R., 60.

The fourth and fifth exceptions are that such contracts are reported to be "within the meaning of § 2440 of New Code," when the contrary should have been reported.

Upon this point the report sustains itself, and we need add nothing to it. The same construction is given in an opinion delivered to-day by Judge Snodgrass in *McGrew* v. *Produce Exchange*.

The Commission cited no authority for its holding, at the conclusion of the report, that "the defendants must be held liable individually as confederates in unlawful transactions." Nevertheless, that proposition of law is sustained by authority, both in cases of criminal and in cases of civil liability. Judge Catron said, in *State* v. *Smith:*

"It is insisted that those who encourage and promote gaming are not subject to indictment by the Act of 1803. This is clearly a mistake, for two reasons. Let us put a case: Say four persons sit down to play loo; one of the parties bets nothing himself, but plays for another. Here he who plays encourages the match without betting. To adopt the construction contended for, neither is indictable. Still, in point of fact, they are both guilty of gaming. In offenses inferior to felony, there are no accessories; all concerned in their commission are principals." 2 Yerg., 273.

This language is quoted and approved in *Howlett* v. *State*, 5 Yerg., 153, for the purpose of holding one who did not bet himself, but played cards with others whom he knew to be betting, guilty of encouraging and promoting gaming.

In *Lear et al.* v. *McMillen*, 17 Ohio St., 469, the Court said:

"If the plaintiffs in error were in fact engaged in maintaining and carrying on an illegal business of gaming, it is not for *them* to set up the illegality of the business or of the contract between them to defeat their joint liability. It is a well-known rule of law that when an illegal *conspiracy* is proven, the acts of each conspirator are held as the acts of all. It is true their illegal contract is not binding *between* them, but it is binding *upon* them. It gives no legal *rights*, but it imposes upon them legal *liabilities*. Having established their *joint* proprietorship, the defendant in error, *by proving the receipt of money by one, proved its receipt by all, and entitled himself to a joint recovery against all.* The real 'winners' of the money are the proprietors of the business, who, by the terms of the contract between them—no matter if it be an illegal contract—are to furnish the funds, pay the losses, and receive the winnings. The dealer is their agent, and they are estopped from denying his power to bind them. His winnings are their winnings, and his receipt of money won is their receipt. Any other construction of the law would render it utterly ineffective. It would only be nec-

essary to put forward an irresponsible 'dealer' in order that the real gamblers, who grow rich by his winnings, might evade the law. This would be to hold the nominal party and let the real party escape—to convict the 'dealer' and acquit the *double dealer*. It would be of little avail to set aside the 'game' by which the plaintiff has been defrauded of his money, and allow him to recover it back, and yet allow the *deeper game*, by which the law itself is to be defrauded of its purpose, to have its intended effect."

It cannot be seriously controverted, in the face of this record, that the defendants were having the business, detailed in the report, conducted for their benefit. That such was the fact is not denied by any exception to the report; nor could it have been successfully denied by exception or otherwise. That they did not make the contracts themselves in person with Dunn is of no importance. The acts of one Herndon, whom they put forth for that purpose, were their acts, for which they are individually and jointly liable.

The bill is in time as to all of the items allowed by the Chancellor, though such items were not lost within "ninety days" next before the filing of the bills. This is the suit of the wife, by next friend, to recover money lost by her husband. It is only the *party losing the money* who must sue within "ninety days;" but suit by, or on behalf of, the wife is not barred if brought "after the expiration of the ninety days, and within twelve months thereafter." New Code, § 2441.

The Chancellor improperly refused, and the Commission properly allowed, the defendants the set-off claimed by them. The reason and authority for its holding are stated in the report.

All exceptions are overruled, the report is confirmed, and decree of the Chancellor is modified accordingly.