## Peters et al., Appellants, *v.* Grim.

*Stock contracts—Purchases on margin—Delivery.*

A purchase of stock for speculation even when done merely on margin is not necessarily a gambling transaction. If there is not, under any circumstances, to be a delivery as part of and completing a purchase, then the transaction is a mere wager; but if there is in good faith, a purchase, then the delivery may be postponed or made to depend on a future condition, and the stock carried on margin or otherwise in the meanwhile, without affecting the legality of the operation.

*Stock gambling—Deposit with broker when recoverable.*

Although purchases and sales of stock effected through a broker are gambling transactions, yet when the parties have settled the account and the broker has paid over the profits, leaving nothing in his hands but a deposit of his customer's money for further operations, he cannot set up the illegal character of the transactions when sued for the deposit.

Argued Feb. 4, 1892. Appeal, No. 197, Jan. T., 1892, by plaintiffs, E. D. Peters et al., from judgment of C. P. Lehigh Co., Nov. T., 1890, No. 59, compulsory nonsuit. Before PAXSON, C. J., GREEN, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Assumpsit for money had and received.

The evidence on the trial before ALBRIGHT, P. J., was to the following effect: Plaintiffs, through defendant, Abraham S. Grim, a stock broker, bought and sold stock. These transactions showed profits, the amounts of which were duly paid over to the plaintiffs. At the close of the transactions, defendant retained in his hand the sum of $500, which was the amount of a draft paid by plaintiffs as a deposit with the defendant as security. Other facts appear by the opinion of the Supreme Court. This suit was brought to recover the $500. The court below, at the conclusion of the plaintiffs' evidence, entered a compulsory nonsuit and afterwards refused to take it off.

*Errors assigned* were (1–3) the refusal to take off the nonsuit.

*D. D. Roper* and *C. J. Erdman*, for appellants.—There is wanting in this case the element which distinguishes gambling contracts from lawful speculations—the intention not to deliver: Fareira v. Gabell, 89 Pa. 89; Smith v. Bouvier, 70 Pa. 325.

The determination by the court that the transaction was a gambling one was error.   Whether the contract is a wagering one, is a question for the jury: Fareira v. Gabell, supra; Thompson v. Reiber, 123 Pa. 457.

Although the stock transactions were wagers, the defendant cannot avail himself of that fact under the circumstances of this case: Brooks v. Martin, 2 Wal. 70; Tenant v. Elliott, 1 Bos. & Pul. 3.

*Edward Harvey*, for appellee, cited Brua's Ap., 55 Pa. 294; Maxton v. Gheen, 75 Pa. 166; Fareira v. Gabell, 89 Pa. 89; Ruchizky v. De Haven, 97 Pa. 202; Dickson's Executors v. Thomas, 97 Pa. 278; Johnson v. Hulings, 103 Pa. 498; Armstrong v. Toler, 11 Wheat. 258; Ham v. Smith, 87 Pa. 63; Waugh v. Beck, 114 Pa. 422; Cannan v. Bryce, 3 B. & Ald. 179; McKinnell v. Robinson, 3 M. & W. 434; Watson v. Murray, 23 N. J. Eq. 263; Watson v. Fletcher, 7 Grat. 1; Alford v. Burke, 21 Ga. 46; Abbe v. Marr, 14 Cal. 210; Spalding v. Preston, 21 Vt. 9; Holman v. Johnson, Cowp. 342.

OPINION BY MR. JUSTICE MITCHELL, May 9, 1892.

A purchase of stock for speculation, even when done merely on margin, is not necessarily a gambling transaction.   If one buys stock from A, and borrows the money from B to pay for it, there is no element of gambling in the operation, though he pledge the stock with B as security for the money.   So if instead of borrowing the money from B, a third person, he borrows it from A, or in the language of brokers, procures A to " carry " the stock for him, with or without margin, the transaction is not necessarily different in character.   But in this latter case, there being no transfer or delivery of the stock, the doubt arises whether the parties intended there should ever be a purchase or delivery at all.   Here is the dividing line.   If there was not under any circumstances to be a delivery, as part of and completing a purchase, then the transaction was a mere wager on the rise and fall of prices, but if there was in good faith a purchase, then the delivery might be postponed, or made to depend on a future condition, and the stock carried on margin or otherwise in the meanwhile, without affecting the legality of the operation.   Peters testified that he bought and sold the stock, that it was kept protected by him, that is he paid up

at all times whatever margin was necessary to make it a sufficient security in the broker's hands for the latter's advance of money, that the stock was at all times held subject to his order, and that when it reached a "bottom price" he was to pay up the full amount and take up the stock absolutely. On this evidence plaintiff was entitled to go to the jury, and if they believed this was a fair and accurate account of the transaction as the parties really intended it, they would be justified in finding it lawful.

But this question is not really material in the present case. Whatever the character of the transactions they were closed and done. When the last sale was made by Peters' order a profit was made, an account rendered, and the entire profit paid over, leaving in defendant's hands only the amount of the original deposit, which was recognized by both parties as plaintiff's money, held as such by defendant subject to plaintiff's order, on the expectation to be sure that it would be used again in similar transactions, but with no authority in defendant, or anybody else, to use it in that or any other way, without plaintiff's direction. Peters was asked on cross-examination : " When the stock was sold you left the five hundred dollars with him to be invested again in the same sort of transaction? A. Yes, provided I felt like investing—it was in his hands subject to my call. Q. That is you could either authorize it to be invested or call the money back? A. Yes." In the business view of the witness this was a new start, and the legal view is the same. If when the first deposit was made by plaintiff with directions to buy the stock, he had countermanded the directions before anything was done under them, it could not be pretended that defendant could have retained the money on the ground of illegality in the contemplated transaction. Intent as to a future act does not make illegality. There is always a locus penitentiæ, and just as much in regard to a second act, as to a first, if the second is distinct and separate. Even therefore if it be conceded that the transactions of plaintiff and defendant were gambling they were over and settled, the money that was in defendant's hands was there not as profits, but as a new deposit of plaintiff's money in contemplation of new transactions as to which plaintiff changed his mind, as he was entitled to do, and which therefore never took place. The

money was and remained his, and the evidence so far in the
case shows no reason why he should not have it back.

No precise precedent has been found for the present state of
facts, but the principles upon which it is to be determined are
perfectly plain, and are moreover in entire accord with the law
heretofore declared in Swan v. Scott, 11 S. & R. 155 ; Lestap-
ies v. Ingraham, 5 Pa. 71, and Fox v. Cash, 11 Pa. 207.    The
distinction which later cases have so fully developed between
the application of the maxim *nemo allegans turpitudinem suam
audiendus est*, to cases of private fraud between the parties, and
cases of acts made illegal by statute or by public policy (see
Bredin's Ap., 92 Pa. 241) does not affect the present contro-
versy.   In dealing with stock transactions falling within or in
any way connected with wagering contracts the law of Penn-
sylvania is of exceptional, and for myself I would say, of illogi-
cal and untenable severity in its interference with the business
contracts of parties sui juris, and entirely competent to man-
age their own affairs.   But even in this class of cases the deci-
sions have only gone so far as to sustain the opening of the
whole transaction after it has nominally closed where the de-
mand is for a part of the actual gains or losses of the illegal
acts.   See Brua's Ap., 55 Pa. 294; North v. Phillips, 89 Pa.
250 ; Dickson v. Thomas, 97 Pa. 278; Griffiths v. Sears, 112
Pa. 523.   Even Fareira v. Gabell, 89 Pa. 89, and Ruchizky v.
De Haven, 97 Pa. 202, two extreme cases of which it is justly
said by Mr. Biddle in his Law of Stock Brokers, p. 308, that
they are " opposed in principle to all the decisions, both of the
English courts, and of every court of every state in the Union,"
were decided upon the ground that the cause of action was loss
in the illegal transactions.   Gains in the same transactions
would undoubtedly stand upon the same footing, but it must
be said to the honor of a class of business men often harshly
criticized, that cases of refusal by a broker to pay over profits
to his customer, are of the rarest occurrence.

As already said, there must be a time when the transactions
are closed and their illegal character no longer attaches.   It
was reached in the present case, if the illegality ever existed,
when the parties settled the account and defendant paid over
the profits, leaving nothing in his hands but a deposit of plain-
tiff's money for further operations.   Such future operations

were dependent on plaintiff's will, and when he changed his mind and determined not to enter upon them, he was entitled to have his money back.

Judgment reversed and procedendo awarded.