# Brua's Appeal.

1. Facts found by auditors are conclusive unless shown to be a clear mistake.

2. A wager about the prospective price of stocks is not enforceable at law on account of the consideration.

3. A contract to purchase shares of stock without the intention to deliver or receive them is a gaming contract.

4. Bonâ fide time contracts about real subjects of purchase and sale are valid although they may be affected by the rise and fall of the market, for the losing party has something for his money.

May 15th 1867. Before WOODWARD, C. J., THOMPSON and AGNEW, JJ. STRONG and READ, JJ., absent.

Appeal by S. M. Brua, from the decree of the Court of Common Pleas of Lancaster county, confirming the report of auditors, making distribution of the moneys in the hands of John Quigley and John Kauffman, assignees of Gideon Kauffman.

Gideon Kauffman, having made an assignment for the benefit of creditors to the assignees on the 11th day of May 1866, presented to the court their account, showing a balance of $6598.08 in their hands, and auditors were appointed to distribute it amongst the creditors.

The controversy in the case was upon the following written contract and notes:—

"Lancaster, April 25th, 1863.

I have this day sold and agreed to deliver to J. S. Hollinger, or to his order, twenty-five days from this date, two hundred

[Brua's Appeal.]

shares Harlem Railroad common stock at the rate of sixty dollars per share.                                                    GIDEON KAUFFMAN.

$1000.                                              Lancaster, April 25th 1863.
Twenty-five days after date, I promise to pay J. S. Hollinger, or bearer, one thousand dollars, without defalcation, for value received.                                                GIDEON KAUFFMAN.

$1000.                                              Lancaster, May 7th 1863.
Thirty days after date, I promise to pay to the order of J. S. Hollinger, one thousand dollars, without defalcation, value received.                                                   GIDEON KAUFFMAN.
                                              Endorsed, J. S. HOLLINGER.

$1000.                                              Lancaster, May 7th 1863.
Thirty days after date, I promise to pay to the order of J. S. Hollinger, one thousand dollars without defalcation, for value received.
                                                   GIDEON KAUFFMAN.
                                              Endorsed, J. S. HOLLINGER.

$1500.                                              Lancaster, May 9th, 1863.
On the first day of April, one thousand eight hundred and sixty-four, I promise to pay to J. S. Hollinger, or order, fifteen hundred dollars, with interest, without defalcation, for value received.
                                                   GIDEON KAUFFMAN.
                                              Endorsed, J. S. HOLLINGER."

The auditors reported that D. G. Swartz was the holder of the notes and claimed a dividend on them, " as having come to his hands as collateral security for a claim due him from Hollinger, amounting on April 13th 1866, to $2869.54. The note of April 25th 1863, was given as collateral security for the performance of the written contract of the same date. * * *

" It may be, that the contract and note formed features of an operation by Kauffman, known in stock circles as 'selling short;' but the vice of that was simply a moral one, and the auditors are unable to detect in the note anything like a failure or deficiency of consideration."

By an " amended report" the auditors found

" That all of the so-called 'Hollinger notes' derived their origin from the same transaction, and are all alike free from any legal vice in their creation, or any deficiency in their consideration. As stated in the original report of auditors, the first of these notes, dated April 25th 1863, for one thousand dollars, at twenty-five days, payable to J. S. Hollinger or bearer, was given as collateral security for the performance of a written contract of the same date, by which Kauffman declared that he had sold, and engaged to deliver to Hollinger in twenty-five days, two hundred shares

of Harlem Railroad common stock at $60 per share.   The evidence, so far as it reaches the remaining three 'Hollinger notes,' places them on no worse footing than the first.   Shortly after the execution of the contract and of the first note, Harlem stock commenced, and for some time continued to rise in market value, and as the first note was given as 'a margin,' the others were given to make good the 'differences,' or to replenish the 'margin' from time to time exhausted by the rise in the price of the stock. Doubtless the contract and four notes were the component parts of a stock-gambling transaction, in which Kauffman in effect betted that in twenty-five days Harlem stock would sell at less than $60 per share ; but viewed in the light of legal principles and precedents, the contract was one which the parties were free to make, and the obligations created by it, and the subsequent notes are in law untainted by any fraud, deceit or want of consideration.   That Mr. Swartz may have received them after maturity, signifies nothing, for there is nowhere any evidence of any other transaction or of any equities between Kauffman and Hollinger."

Dividends were therefore awarded to Swartz on the notes, and the Court of Common Pleas (Hayes, A. J.,) on exceptions confirmed the report.

On appeal the decree of confirmation was assigned for error.

*N. Ellmaker* and *J. B. Livingston*, for appellants, cited Story on Promissory Notes, § 189 ; Porter *v.* Gunnison, 2 Grant 297.

*T. E. Franklin, A. H. Smith* and *O. J. Dickey*, for appellees.

The opinion of the court was delivered, July 3d 1867, by

THOMPSON, J.—Participation in the distribution of the funds in the hands of the assignee of Gideon Kauffman, an insolvent debtor, now deceased, by Swartz, the appellee, was resisted by the creditors of the former, on the ground that the four notes held by him, were given by Kauffman to Hollinger, without consideration, on a wagering contract, and passed to the appellee as collateral security for a debt due him by Hollinger, after maturity.

The auditors to report distribution of the fund awarded to the appellee a *pro rata*, notwithstanding the objection noticed, and notwithstanding a finding of the facts substantially in accordance with the objection taken.

It appears that Kauffman, by a contract in writing, dated Lancaster, April 25th 1863, "sold and agreed to deliver to J. S. Hollinger, or to his order, twenty-five days from date 200 shares Harlem Railroad common stock, at the rate of $60 per share ;" and of the same date, delivered to the purchaser his negotiable

note, due simultaneously with the maturity of the contract, for $1000. Three other notes were executed and delivered by him to Hollinger, dated respectively, two of them the 7th and one the 9th of May following, amounting in the aggregate to $3500, two falling due in thirty days from date, and the last of the three on the 1st of April 1864. It became a material inquiry to the creditors of Kauffman, as to what was the nature and character of the consideration moving the drawer to execute and deliver the three notes to the buyer of the stock, and on this point the auditors, after stating the facts in substance as above, say in their original report, " it may be, that the contract" (for the sale of stock referred to) " and note" .(of the same date) " formed portions of an operation by Kauffman, known in stock circles as ' *selling short;*' but the vice was simply a *moral one*, and the auditors are unable to detect in the note anything like a failure or deficiency of consideration."

In an amended or supplementary report by the same auditors, the transaction including the entire series of notes, is more clearly developed, and the consideration of the notes unmistakably disclosed. In concluding their reference to the facts, they say, " doubtless the contract and the four notes, were the component parts of a *stock-gambling transaction*, in which Kauffman in effect, betted that in twenty-five days Harlem stock would sell at less than $60 per share ; but viewed in the light of legal principles and precedents, the contract was one which the parties were free to make, and the obligations created by it and the subsequent notes, are in law untainted by any deceit or want of consideration."

Facts found by auditors are conclusive, unless shown to be in clear mistake; that is not pretended here. But their law is more than doubtful. In one sense it is true that a wager about the prospective price of stocks, is a contract which it may be said parties are "free to make," there being no express prohibition of it; but the obligation created although free from "*fraud or deceit*," is not enforcible at law on account of the consideration. Betting and gambling contracts have in this commonwealth been uniformly held to be *contra bonos mores*, and incapable of enforcement at law. Feigned issues in the shape of wagers are the only exceptions, and in these the alleged wager is mere form to ascertain a fact, but not to recover money.

In Edgdell *v.* McLaughlin, 6 Whart. 176, which was a suit on a check given and staked in a betting contract, about the existence or non-existence of a certain letter or note alleged to have been written by the defendant, to one Baker. Sergeant, J., in delivering the opinion of the court, after referring to the facts that at common law most wagers were recoverable by suit or action, said, " fortunately, however, for us, in Pennsylvania there

is no decision in its highest tribunals, that a wager is recoverable; and the only authority that exists on the subject is expressly in point to the contrary. In Pritchett *v.* The Insurance Company of North America, 3 Yeates 438, it was held, in the year 1803, that a policy of insurance in which the insured had no interest, was a wagering policy and as such was void.

"It was at the same time admitted that the stat. of Geo. II., prohibiting these policies in England, did not extend to this state * * on no other ground could the case have been so decided than the common law of Pennsylvania, by which wagers were considered contrary to its genius and policy, and not recoverable by action in a court of law."

"Every species of gaming contract," says Justice Yeates, in delivering the opinion of the court, "where the insured having no interest, or a colorable one merely, or having a small interest much overvalued in a policy, under the cloak of insurance, is reprobated by our law and usage."

A contract to purchase shares of stock without the intention to deliver or receive them, is a gaming contract. Grazewood *v.* Blane, 73 E. C. L. R. 525.

Applying these principles, and they have never in a single instance been departed from by this court, although numerous wagering contracts have been before it, to the case in hand found to be a wager by the auditors, we say the consideration of the notes in question was "insufficient" to entitle their enforcement at law. It is evident, even if the fact were not so found, that the actual transfer of stock between these parties was not contemplated by them. The interesting question to them was the rise or fall of the stock, which, being secured by an adequate "margin" was what they looked to. Kauffman had no stock when he contracted to sell, nor did Hollinger pay for any. Doubtless, pursuant to the understood practice in such cases, he also put up a "margin" to meet the contingency of a fall in the stock. These were simply the stakes of the parties on each side, and were at the end of the game, or rather when the contract was out, what the winning party was to take, and what Hollinger did take. The absence of the thing contracted for would be of the same consequence exactly in such a contract, and no more than in a gambling policy of insurance. It would show its nature, and avoid the obligation created by it.

It is said the form in which this contract appears enters largely into the business of stock brokerage. This is a mistake; the bonâ fide purchase of stocks no doubt can be conducted in a legitimate way, and is so generally, without trenching in the least on the gambler's province. If this be impossible, however, the fewer licenses that are issued for such a business the better. Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount

[Brua's Appeal.]

from another, is gambling, and demoralizing to the community, no matter by what name it may be called. It is the same whether the promise be to pay on the color of a card, or the fleetness of a horse, and the same numerals indicate how much is lost and won in either case, and the losing party has received just as much for the money parted with in the one case as the other, viz.; nothing at all. The lucky winner of course is the gainer, and he will continue so until fickle fortune in due time makes him feel the woes he has inflicted on others.

All gambling is immoral. I apprehend that the losses incident to the practice disclosed in this very case, within the past five years, have contributed more to the failures and embezzlements by public officers, clerks, agents and others acting in fiduciary relations, public and private, than any other known, or perhaps all other causes; and the worst of it is, that in the train of its evils, there is a vast amount of misery and suffering by persons entirely guiltless of any partition in the cause of it.

Bonâ fide time contracts about subjects of actual purchase and sale of stocks and other property, seem from custom necessary in our country, and when they are so, although they may be greatly affected by the rise and fall of the market, yet they are not obnoxious to the objection to this transaction which we are considering, for the losing party has at least something for his money, but the losing gambler has nothing.

That the transaction in this case assumed the form of a contract about a matter lawful in itself, was not conclusive as to its real motive, as the finding shows. That was the form which the South Sea bubble took in England, the tulip speculation in Holland, and the morus multicaulis in this country; and the form served only as a thin covering of the most frightful systems of gambling ever known.

But not to enlarge; the finding of the auditors that the notes in question were in a " stock gambling transaction;" that Kauffman betted the amount covered by them, that Harlem stock would fall below $60 per share in twenty-five days; that this was known by the holder; that they were taken *past due*, and as collateral security for a precedent debt, establishes that there was no legal consideration for them in the first place, and that the holder was not in a position to escape the taint that renders them worthless.

We must therefore reverse the decree of the court confirming the auditor's report; and we will send the case back for distribution on the principles herein settled. They are not entitled to any distributive share in the hands of the assignee.

        Now, to wit, July 3d 1867, the decree of the Court of Common Pleas of Luzerne county in the above case is reversed, and the record is remitted to be proceeded in as above indicated. The costs of the appeal to be paid by the appellees.