### BURNEY et al. v. BLANKS.†

(Court of Civil Appeals of Texas. Feb. 15, 1911. Rehearing Denied April 19, 1911.)

1. GAMING (§ 11*)—DEALING IN FUTURES—DELIVERY.

A contract for the sale of cotton was not within the act of 1907 (Acts 30th Leg. c. 86), prohibiting the dealing in futures and future contracts, where the cotton was actually delivered.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 19; Dec. Dig. § 11.*]

2. GAMING (§ 49*)—ACTION—SUFFICIENCY OF EVIDENCE—TERMS OF CONTRACT.

In an action upon a contract for the purchase of cotton, evidence *held* to show that defendant sold the cotton to plaintiff at the market price, and the parties agreed that, if that grade of cotton advanced before a date following, defendant could, upon demand, collect the difference between the price at the time of demand and that paid at time of sale, and, if no demand was made and the market value was less on such date than the amount paid for it, plaintiff could collect the difference from defendant.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 102; Dec. Dig. § 49.*]

3. GAMING (§ 11*)—DEALING IN FUTURES—ACTUAL DELIVERY.

Though the cotton was actually delivered at the time of the sale, the agreement was void as a wagering contract, since, except under the option provisions thereof, which constitute the wagering feature, only plaintiff had any real interest in the cotton after its sale and delivery.

[Ed. Note.—For other cases, see Gaming, Dec. Dig. § 11.*]

4. GAMING (§ 12*)—LEGALITY—DEALING IN FUTURES.

Gambling contracts, such as contracts dealing in futures, are contrary to public policy and unenforceable.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 22; Dec. Dig. § 12.*]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Action by J. G. Blanks against J. G. Burney and another. From a judgment for plaintiff, defendants appeal. Reversed and rendered.

J. M. Patterson and D. H. Doom, for appellants. Gregory, Batts & Brooks and J. H. Hart, for appellee.

KEY, C. J. The plaintiff, James G. Blanks, brought this suit and recovered judgment against the defendants J. G. Burney and J. B. Lamb upon the following written contract:

"The State of Texas, Caldwell County.

"Know all men by these presents, that James G. Blanks, of Lockhart, Texas, and J. G. Burney of Austin, Texas, J. B. Lamb of Lytton Springs, have this day made and entered into the following contract of sale, to wit:

"The said James G. Blanks has this day bought from the said J. G. Burney et al., about 200 bales of cotton to be delivered at Lockhart, Texas, not later than the ———— day of March, 1908, by said Burney et al., for which said cotton said Blanks agrees and binds himself to pay the sum of 10.80 cents per pound straight.

"It is further agreed and understood by all parties hereto, that the said Burney et al., the owners of the cotton herewith sold to said Blanks, shall have the option of calling on the said Blanks for an additional settlement on any day between the hours of nine in the forenoon and two in the afternoon, up to and including the 29th day of

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes
† Writ of error denied by Supreme Court.

April, 1908. And if upon the day said parties, Burney et al., demands such settlement, the price of cotton shall be in excess of the price this day paid to said parties for said cotton, then said Blanks agrees and obligates himself to pay to the said parties, Burney et al., the difference in the price this day paid for said cotton, to wit, 10.80 cents and the price of cotton on the day that demand is made by said parties for settlement.

"It is further agreed and understood that if the said Burney et al. shall not demand an additional settlement under the terms of this contract, within the time herein specified, then the said J. G. Blanks shall have the option of demanding an additional settlement with the said Burney et al. on the 30th day of April, 1908, and if on said April 30, 1908, the price of cotton shall be less than that this day paid for said cotton, to wit, 10.80 cents, then the said Burney et al., the owners of the cotton this day sold to said Blanks, promise and obligate themselves to pay to said Blanks the difference in the price of said cotton on said dates.

"It is further agreed and understood that in estimating the value and price of cotton when demand is made for an additional settlement under this contract, the price shall be fixed by taking the price of middling cotton at New Orleans and deducting therefrom 65 points.

"It is further agreed and understood that the said Burney et al. shall have the option of demanding a settlement for 100 bales at any time as above specified in this contract, and that they can then demand settlement on the balance at any time up to and including the 29th day of April, 1908, within the hours above set out. But it is further understood that the first settlement cannot be demanded and had at a less number of bales than 100 bales.

"Witness our hands at Lockhart, Texas, February 28, 1908.

"[Signed] James G. Blanks.
"J. G. Burney.
"J. B. Lamb."

In their answer the defendants presented a general demurrer, certain special exceptions, a general denial, and a special plea, to the effect that the contract sued on related to and involved a gambling transaction and was, for that reason, void and nonenforceable in the courts. The case was tried without a jury, and judgment rendered for the plaintiff for $1,010.53, and the defendants have appealed.

While appellants' brief contains several assignments of error, they all present substantially the same question, and that is that the trial court committed error in not holding that the contract sued on covered a gambling transaction, and therefore was not enforceable by the courts. The plaintiff and the defendant Burney both testified in regard to the transaction, and while there was but little conflict in their testimony, and as the trial court decided the case in favor of the plaintiff and did not file any findings of fact, the case will be disposed of in this court upon the facts as disclosed by the plaintiff's testimony, together with the written contract. After proving up and putting in evidence the written contract, the plaintiff testified as follows:

"I purchased some cotton from Burney and Lamb under that contract. It was to be in the neighborhood of 200 bales when we made the contract. I believe 133 bales were actually delivered to me; I do not remember the exact number of bales delivered, but it was a good deal less than 200; about 133 bales were delivered by them. According to the contract, the price was 10.81. As to the average weight of those bales, I figured it at 524 pounds. We lost the papers, and I asked the manager of the warehouse the cotton came out of, and together we estimated the average weight at 524 pounds. I could not say exactly the amount I paid for the cotton. I went to the bank to get the amount of the check, but the check had been returned, and I did not have any record of it and the bank did not have any record, as they figured the checks together, and I could not get the amount. However, I know that that was about the weight, 524 pounds, as the average weight would not miss it 10 pounds to the bale. That cotton was delivered to me a short time after the contract was made, and I paid them in cash. Neither Mr. Burney nor Mr. Lamb afterwards called on me for any additional payment. I know what the price of middling cotton was in New Orleans on the 30th of April, 1908; it was 10 cents per pound, and deducting 65 points from the New Orleans price would make the net price 9.35. I paid the defendants, I think, 10.81 or 10.80. I have made request or demand of the defendants for the difference, but they have not paid it.

"With reference to the purpose in entering into this contract, about that time some of the people were storing cotton in the warehouse and borrowing money on it, and the banks wanted their money. Mr. Burney was talking to me, and he said, 'I believe cotton is going up. I will just send mine to Houston and let it go on to Liverpool. I can draw forty or forty-five dollars against it.' I said, 'I will take your cotton to-day, and pay you what it is worth to-day.' I think my proposition was 10.75. 'I will take your cotton now, and give you 60 days; that's the time you are going to borrow money on the cotton. I will give you that time for it to go up, and if it goes down you pay me.' He said, 'I think that will be a good thing.' He came back to me the next day, and said, 'Make that 10.80.' I said, 'All right; the market is up a little bit to-day.' He and Lamb were together, and there were some others. I said, 'How many bales?' And he told me, 'There will be in the neighborhood of 200 bales.' I said, 'All right.' He said,

'Who will make the contract?' I said, 'We will make it.' He said, 'No, let's have a regular contract drawn up by a lawyer.' I said, 'Who do you want?' He said, 'Coopwood.' I said, 'All right; go and get him,' and we had the contract drawn up accordingly.

"I paid the defendants the market price on that day. Cotton advanced in a few days afterwards, but went down again. I have figured the difference between what cotton was worth on the day we made the contract and what it was worth on the 30th day of April, 1908. The difference between 9.35 and 10.80 is 1.45 cents per pound. The total amount is a matter of calculation. I will calculate the total amount. I have calculated it, and it is $1,000.53."

Cross-examination: "The cotton was there on the compress platform at the time we made the contract; it had just been taken out of the warehouse. There were some warehouse receipts for the cotton. The cotton had not been compressed at that time. Mr. Burney said something about shipping the cotton to Houston or Galveston; I have forgotten which. There were some other gentlemen that were going to ship their cotton down there and draw money on it, and Mr. Burney said he believed he would do the same thing. I don't know for sure whether the date of the contract—February 28, 1908—was the day on which the trade was closed for the 133 bales, or whether we closed the trade the day after; Mr. Burney perhaps remembers that; I don't remember that, but it was right about that time. It is not a fact that this contract was entered into after the spot trade was closed; the contract was all together. The contract was signed up in Coopwood's office, and I gave Mr. Burney a check over in the bank, as I remember. The warehouse receipts were in the bank. I don't know whether I ever had hold of the warehouse receipts myself or not. I gave my check to Mr. Burney, and he either turned the receipts over to the bank, or they were already in the hands of the bank. I bought the cotton myself, and I got possession of the cotton. I don't remember what I did with that cotton; I could not remember that particular cotton, for I am buying and selling every day. I considered the title to that cotton changed at that time. I got the warehouse receipts within two days of the making of the contract. I got the cotton absolutely, to do with it as I pleased. There is an error in the calculation of the total amount; it should be $1,010.53.

"I have been in the cotton business since December, 1880, and am familiar with the methods used in buying and selling cotton. Sometimes I have a contract to deliver spot cotton in the future, at a certain price, and protect that contract against fluctuation. If I see the market is going against me, I hedge it. If I have some cotton bought and on hand, or bought and to be delivered at a future time—for instance, if I have bought 100 bales of cotton, to be delivered to me during October, November, or December, —and I see the market is going against me, I jump out and hedge it. If I have some cotton bought and got a good profit on it, then I will hedge it to secure that profit, and not take any further chances on it. The law gives us the right to do that. As to whether or not it was the purpose of this contract to hedge a sale, it was, if I wanted to. It was my purpose, as soon as I got a profit in it, to hedge it. Of course, it was a speculation; if the price went down I made money, and if it went up they made money. If I had felt that the price of cotton was going up, I would not have gone out and hedged the contract with the bucket shop; I don't deal with bucket shops at all. I would carry the contract myself. I would either buy or sell to protect myself, if I had felt like it was necessary."

Redirect: "It cost 65 cents a hundred freight from Lockhart to New Orleans. We were dealing with the market value of middling cotton, less the freight. My proposition to Mr. Burney and Mr. Lamb was that I would give them what the cotton was worth that day and give them 60 days; and if it went up I would give them the advance, and if it went down I would get it. That was the proposition, and it was subsequently reduced to writing. It was reduced to writing before the delivery of the cotton and the payment of the money; I am most positive of that."

[1] As there was an actual delivery of the cotton, this case does not come within the purview of the act of 1907 (Acts 30th Leg. c. 86), prohibiting dealing in futures and future contracts. However, we are of the opinion that the terms of the contract, as well as the plaintiff's petition and his testimony, disclose the fact that he is attempting to use the courts for the purpose of collecting a wager. In his petition he sets out the terms of the contract, alleges that, on February 28, 1908, the defendants delivered to the plaintiff, and he purchased from them, 133 bales of cotton of the average weight of 524 pounds per bale, and for which cotton on said date he paid the defendants 10.80 cents per pound; that thereafter, up to and including April 29, 1908, the defendants made no demand on him for an additional settlement or payment to them for the cotton; that on the 30th day of April, 1908, the price of middling cotton in the city of New Orleans was 10 cents per pound, and that on that date the plaintiff demanded of the defendants that they pay him the difference between the sum he had paid for the cotton and the price of middling cotton in the city of New Orleans on said April 30, 1908, after deducting 65 points from said New Orleans price, or the sum of 9.35 cents per pound; that the defendants failed and

refused to pay to the plaintiff the sum of such difference, etc. Thus it will be seen that the plaintiff sued to enforce the option in his favor contained in the contract.

[2] We think it appears from the appellee's own testimony, as well as that given on behalf of the appellants, that the defendants sold to the plaintiff 133 bales of cotton at the market price of cotton at the time and place of the sale, and that the parties then and there agreed that, if the same grade of cotton should advance in price between that date and the 30th day of April, following, the defendants would have the right, upon demand, to collect from the plaintiff the difference between the price of such cotton at the time the demand was made, and the price which the plaintiff had paid the defendants for it. And, on the other hand, if no such demand was made by the defendants, and on the 30th day of April the market value of the grade of cotton referred to was less than the amount the plaintiff had paid for it, then he should have the right to collect the difference from the defendants. It is conceded in appellee's brief that the amount paid was the market value of the cotton at that time.

[3] If this is what the transaction was, we are unable to distinguish it from a bet or wager.

[4] It is now well settled in this state that gambling contracts will not be enforced by the courts; and before the enactment of our statute making it unlawful to deal in futures it had been decided, in Seeligson v. Lewis, 65 Tex. 215, that such contracts were contrary to public policy, and not enforceable in the courts. That proposition of law is not controverted by appellee's counsel, but their contention is that the contract sued on, and the transaction covered by it, do not disclose an intention to bet or wager. On the contrary, they contend that it was the intention of the defendants to sell, and of the plaintiff to buy, 133 bales of cotton at a price to be determined by the market value of that grade of cotton at a future time, and that the payment then made by the plaintiff to the defendants, which, it is conceded in appellee's brief, was the market value of the cotton on that day, was not made in full payment for the cotton, but merely as an advance or partial payment. In our opinion, neither the terms of the contract nor the testimony given by the plaintiff support that contention. On the contrary, they show that the cotton was sold and bought at the then existing market price, and that the agreement in reference to future settlements, while made at the same time and in connection with the contract of sale, was not intended to fix the consideration for the sale or the price to be paid for the cotton. There is no ambiguity in the terms of the contract by which the defendants agreed to sell to the plaintiff, and the plaintiff agreed to purchase from the de-

fendants, the cotton for a consideration of 10.80 cents per pound. The contract itself specifically specifies that as the amount of consideration which the plaintiff was to pay for the cotton, and the further stipulations contained in the contract do not in any wise modify the stipulation referred to. The other stipulations securing to each party an option to demand an additional settlement do not prescribe that the amount paid as a result of such settlement shall be any part of the consideration for the cotton. In fact, an additional settlement under the option conferred upon the plaintiff could not result in an additional payment for the cotton, because such payment would be made by the seller to the purchaser, instead of by the purchaser to the seller.

Nor is it material that the optional feature of the contract was made at the same time and in connection with the contract of sale, and that the thing sold was actually delivered. The law condemns gambling contracts, including those disguised under the forms of legitimate business. 14 Am. & Eng. Ency. Law, pp. 603, 604; 20 Cyc. p. 921. The last volume cited defines a wager as follows: "A wager is a contract by which two or more parties agree that a certain sum of money or other thing of value shall be paid or delivered to one of them upon the happening of an uncertain event; it implies that each of the parties shall jeopardize something and have a chance to gain something or to recover the stakes or thing bet or wagered upon the determining of the contingent or uncertain event in his favor, and hence is a form of gambling."

In support of the proposition that the fact that the optional features of this contract are connected with the contract of sale, and an actual delivery of the cotton does not legalize its optional feature; we refer to First Nat. Bank v. Carroll, 80 Iowa, 11, 45 N. W. 304, 8 L. R. A. 275. In that case the contract read as follows: "Creston, Iowa, December 5, 1888. In consideration of $30 paid to me this day by L. J. Cusick, I hereby guarantee to him that the five cars of cattle shipped by Cusick Bros. on December 3, to Chicago, shall sell in Chicago for 4c. per pound, and he having a one-half interest in said cattle; I agree to make good to him any loss by reason of the said cattle selling for less than 4c. That is, I am to pay him the difference, if any, between the price the cattle sell for and the 4c. on his half interest, in case they sell for less than 4c. Said difference to be paid to him on receipt of account sale, and if said cattle sell for more than 4c., I am to have the difference. C. W. Carroll. I agree to pay C. W. Carroll whatever said cattle sell for over 4c. on my half interest. L. J. Cusick."

We also make the following quotation from the opinion of the court in that case: "Appellant likens this contract in its purposes and effect to option deals, which are

held to be gambling contracts, and void. Appellee, however, urges as a distinct measure that in option deals there is no actual property as the basis of the transaction, and no property is intended to be delivered or received, while in this case the cattle actually on the way to market formed a basis of the transaction, and it is urged that by the contract the cattle were sold to Carroll, or, at least, an interest therein. We are unable to find any language in the contract evincing such a purpose. Cusick Bros. shipped the cattle; they were to sell the cattle in Chicago, and the contract in question is an executory one, to be performed after the cattle are sold. The transaction was clearly one as to price. The disposition of the cattle is precisely what it had been, had the contract not been made. Cusick Bros. sold the cattle, as they intended to, for what they would bring on the market and received the pay therefor, and this would have been the situation without the contract in question. The parties to the contract dealt alone with what would be the market price when the cattle should arrive in Chicago. The market price represented the actual value of the cattle. If the market price was above the four cents per pound, and Cusick paid the excess to Carroll, Carroll received something for nothing. If the market price was less, and Carroll paid to Cusick the difference, then Cusick received more than the value of his cattle, or, in other words, something for nothing, and such receipts are the spirit and soul of gambling enterprises. Brua's App., 55 Pa. 294, gives the following definition: 'Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another is gambling.' This transaction was clearly one in which the parties intended to pay the gain or loss as a market price at a future time would require, without intending to deliver property, and under the rule given in the Pennsylvania case (55 Pa. 294) it was a wager. The mere fact that there was specified property about which the transaction occurred would make no defense. Parties may as effectually gamble with reference to actual property as with reference to the prices of different kinds of property. The cases do not turn upon that point, but upon the actual intention of the parties."

In appellee's brief it seems to be conceded that in contracts of this character, if the parties have no interest in the future contingency, upon the happening of which one or the other is to be paid a sum of money, other than the interest secured to them by the contract, then such contract is a wager, and not enforceable; but it is contended that, aside from the optional feature of this contract, both parties had an interest in the subsequent value of the thing sold. We are unable to sanction that contention. The cot-

ton having been sold by the defendants to the plaintiff, and he having paid the full consideration therefor, the defendants were not thereafter interested in the value of the cotton. It no longer belonged to them, but to the plaintiff, who had paid the contract price for it. Hence it follows that, after the sale was made and the cotton paid for, only one, and not both, of the parties, had an interest in its subsequent value, except as such interest was created by the optional feature of the contract.

Upon the whole case, which has been thoroughly developed, our conclusion is that appellees cannot maintain their suit, and therefore the case is reversed and here rendered for appellant.

Reversed and rendered.