## BAUCUM & KIMBALL v. GARRETT MERCANTILE CO. et al.*

### No. 5391.

Court of Appeal of Louisiana.
Second Circuit.

April 1, 1937.

Rehearing Denied April 30, 1937.

Writ of Certiorari and Review Granted
June 21, 1937.

*Judgment reversed by Supreme Court 178 So. 256.

Ralph W. Baucum, of Shreveport, for appellant.

Seals & Atkins, of Homer, and M. M. Morelock, of Haynesville, for appellees.

DREW, Judge.

Baucum & Kimball is an ordinary partnership, composed of W. P. Baucum and C. A. Kimball. It is engaged in the brokerage business in the town of Haynesville, Claiborne parish, La., and has wire facilities for dealing in future transactions on the New Orleans and New York Cotton Future Market. Its business consisted principally of buying and selling cotton on the future market for itself and its clients and buying cotton "on call," as it termed it. The sale of cotton "on call," as explained by the petition of Baucum & Kimball, is as follows: "The future delivery price of cotton on the New York Cotton Exchange is quoted for January, March, May, July, October and December, and cotton may be sold on the New York Cotton Exchange to be delivered in any of said months. Such a sale is known as a sale for 'future delivery'. If cotton is sold for delivery in March, the actual cotton must be either delivered on or before five full days prior to the close of said month, or the transaction must be transferred to a future month. When cotton is sold 'on call', the seller and the buyer agree on a price of a definite number of points (a point being 1/100 cent) off the selected delivery month price as the base price per pound of the cotton sold. The seller then delivers the actual cotton to the buyer and the buyer advances to the seller the price of the cotton as the same is then quoted on the New York Cotton Exchange for the future month agreed upon, less the agreed number of points off such price. For example: if December, 1935, NY cotton is quoted today at 12.48 and the buyer and seller agree on the base price of 24 points off December New York, the price the buyer advances to the seller today is 12.24 cents per pound, and from this amount the buyer retains an agreed amount per bale, which is usually from $2.50 to $5.00 per bale, as margin. With this margin left to protect the buyer, the seller may then 'call' the cotton at any time prior to the delivery date for December futures and he will receive therefor the quoted December delivery price, on the date the same is 'called', less the agreed 24 points off. Consequently, if the market advances the seller profits the increase in price, and if it declines, he loses said difference between the price on the date of delivery and on the date of the 'call'. However, if the seller does not wish to 'call' the price on or before the delivery date, he may transfer the transaction to some month in the future and the base price will then be 24 points off the future price for the new month, plus six points transfer fee, plus (or minus) the difference between the price quoted for the new month and the price quoted for the old month."

The defendant herein sold to Baucum & Kimball "on call" the following number of bales of cotton:

| Month | Day | Year | Number Bales |
|---|---|---|---|
| 10 | 29 | 31 | 50 |
| 1 | 15 | 32 | 79 |
| 4 | 30 | 32 | 15 |
| 11 | 3 | 32 | 15 |
| 12 | 3 | 32 | 235 |
| 3 | 11 | 33 | 3 |

making a total of 397 bales. All of said cotton was delivered to Baucum & Kimball, hereinafter called plaintiff, on the date of sale, and defendant was at that time paid by plaintiff the actual value of the cotton as fixed by that day's quotation on the New York Cotton Exchange for the future date upon which the price was fixed as the base price, less an agreed amount which was retained by plaintiff as margin. The base

price fixed for the first cotton sold and delivered was at the price of July NY 1932; the second lot delivered at the price of October NY 1932; the third lot at the price of October NY 1932; the fourth lot at the price of July NY 1933; the fifth lot at the price of October NY 1933; and the sixth lot at the price of July NY 1933. Under said sales agreement defendant was granted the right to call the price upon which settlement would be made at any time on or before the date upon which the price of each lot of cotton had been fixed. For instance, on the first lot of 50 bales, defendant had the right to call the price as shown by the New York Cotton Exchange on any date between October 29, 1931, and the last day of July, 1932, and plaintiff was obligated to settle for that cotton on the basis of the price as fixed by the New York Cotton Exchange on the date defendant called it. Plaintiff had no right under the contract to ever fix the price, unless, under certain conditions, the right was implied. In no instance did defendant call the price within the time originally fixed in the contracts. At the end of each period it transferred its contracts to a later date, each time paying an additional commission, until the contracts in each and every one of the transactions were transferred to May NY 1935.

During this period of practically three to four years, cotton had advanced in price and at times had declined. At no time did the price ever go below the original base price in the original contracts. During this period when the margin became excessive, due to the rise in price, defendant drew down part of it. When the margin became insufficient, due to a decline in price, it put up more. The total amount of excess margin withdrawn by defendant during that period was $13,232, and the amount of margin advanced by defendant during the time was $4,250 and 30 additional bales of cotton. The last margin money put up by defendant was the sum of $1,250 on February 5, 1935, at which time plaintiff was notified there would be no more put up. On March 11, 1935, cotton took a decided drop in price and plaintiff called upon defendant for additional margin, which was refused. Acting on said refusal, plaintiff exercised the right to call the price, thereby closing out the contract.

After itemizing and recapitulating the entire transactions, plaintiff found that under the contracts defendant owed it the sum of $1,928.22, being the difference between the amount paid to defendant by plaintiff and the amount received by plaintiff on the transactions. Defendant refused to pay and this suit followed.

There are several defenses set up to plaintiff's demands, one of which is that it is a gambling transaction and not enforceable under article 2983 of the Revised Civil Code. The entire transactions were oral and there is no written contract in regard to any part of it, so far as the record discloses.

▉ The United States Supreme Court and the state courts of all the states of the Union have repeatedly recognized the validity of future contracts where at the time of making the contract there was the bona fide intention of making an actual delivery of the thing sold or of accepting the delivery of the thing bought. The courts are also of the unanimous opinion that future contracts made with the intention that there will be no delivery, but that the settlement between the parties will be based upon and be the difference between the price at the time of the contract and the price at which the transaction is closed out, are unenforceable for the reason they are gambling contracts.

We are of the opinion the present transaction comes under the last rule above announced. There was not to be any delivery in the future. Delivery was made at the beginning. It is not even contended that the delivery was on consignment and the cotton remained the property of defendant until the price was fixed. It is argued in brief, but the facts do not justify the argument. If the cotton had only been consigned, a different situation would confront us. Since there was no written contract, the only way we can arrive at the contract and intentions of the contracting parties at the time of entering into it is by their sworn testimony and judicial admissions in their pleadings. Plaintiff in one place in its petition alleges it purchased from defendant on the dates of delivery to it the cotton and that it paid the future price agreed upon, less a small amount retained as margin. In other places it alleged that, at the time said cotton was bought, it paid for it, less the margin, and then alleged what it sold said cotton for on the date the transaction was closed out.

Both Mr. Baucum and Mr. Kimball, testified. Mr. Kimball's testimony is as follows:

"Q. I understand from your evidence that when cotton is sold to a broker that that cotton is actually delivered to that broker? that is a fact? A. That is right.

"Q. What becomes of the cotton when it is delivered to the broker usually? A. Well that all together depends on what the broker does with it. Of course, the ordinance course of business (ordinary course) that cotton is old, and I imagine that cotton was—that cotton which was delivered by Garrett Mercantile Company at the time of these transactions were sold by Baucum and Kimball several years ago. Sold immediately when it was bought.

"Q. I will ask you just exactly how that cotton is delivered by the seller to the broker. A. Delivered by the seller to the broker?

"Q. Yes, how does he get possession of the cotton? A. He gets possession at the warehouse receipts, cotton receipts or bills of lading. That transfers the title to the broker.

"Q. Then the broker in turn is entitled to dispose of that cotton and do with it as he pleases? A. Yes, sir. That is right.

"Q. Further in connection with sale of cotton on call then what is the balance of the agreement usually after the cotton is sold to the broker on call. Does it mean you have a future transaction from that point on, just as you would in the average future contract? A. It means that you have the only difference between a future contract and a contract on call. The actual delivery is made in the cotton and in a future market there is not a delivery made of the cotton. There is instances where the delivery is made but it is not made at the time of the purchase. That is the difference.

"Q. When there is a settlement closing out this call transaction, as I understand from your statement, that settlement is based on the difference between the original price less commission or some amount agreed on and the amount of the market price when the settlement is made? A. The only difference in the settlement is made totally and solely of the difference the market quotations and the date of sale.

"Q. Then there is to be no further delivery of cotton when the settlement is made under any circumstances? A. Certainly.

"Q. Do you know what happened to this particular cotton involved in this instance? After it was sold to Baucum and Kimball? A. Do I know what particularly happened? I couldn't tell you specifically who we sold it to but we sold it to various concerns. Different companies maybe, I don't know— couldn't tell you off hand.

"Q. You received the cash from those parties I presume, did you not? A. Part of that cotton was sold on call, same as was bought.

"Q. You mean you in turn may have sold a part of it on call possibly all of it and possibly none of it? A. Yes, sir."

Mr. Baucum testified as follows:

"Q. I will ask you, Mr. Baucum, the same question that Judge McClendon asked Mr. Kimball. I will ask you what is the custom in the event call cotton is neither transferred nor the price fixed prior to the close of the month on which the original price is based? A. The cotton would automatically be based at the close of the month. He automatically sells it, there is no other future contract. We would automatically close him out and send him a check for what I owed him or bill him for what he owed me. If a man refused he can't hold it any longer than the month for which it was fixed automatically. * * *

"Q. Do you know what they did with the cotton which they delivered to you? A. I don't know.

"Q. Do you have that cotton now? A. No, sir.

"Q. Do you think you sold it as far back as two or three years ago? A. Well, that cotton was bought in the fall of 1934 as I recall.

"Q. Some bought in 1932? A. Mine was 84 bales. My individual cotton was bought at one time.

"Q. What did you do with that cotton? A. I—

"Q. I meant to ask you about the cotton involved in both suits. A. Of course Mr. Seals that cotton as Mr. Kimball stated, I don't recall what we did with that. Part of that on call to different companies, we handled thousands of bales of cotton that season.

"Q. If you had wanted to you could have sold to anyone? That cotton was delivered to you with warehouse receipts? A. We had a legal and moral right to do with that cotton what we pleased, to keep it, sell it, or not sell it outright."

Defendant does not deny plaintiff's right to sell or otherwise dispose of the actual cotton after it was delivered to it. We therefore have the undisputed fact that plaintiff bought the cotton on the dates shown in 1931, 1932, and 1933; that it was delivered to it by defendant on the dates it was purchased; and plaintiff immediately sold or otherwise disposed of the actual cotton. Neither plaintiff nor defendant had any further interest in the 397 bales of cotton. It had no doubt lost its identity as bales of cotton long before the transaction involved here was closed out.

When the cotton was delivered to plaintiff, it paid defendant for it. The price was agreed upon as of a future date. From that price a certain agreed amount was deducted and there was at that time a like number of bales of cotton purchased for defendant on the board for future delivery, although it was thoroughly understood there was to be no delivery in the future; but between plaintiff and defendant there was to be a settlement at some future time to be fixed by defendant of the difference between the future price, as shown on the New York Cotton Exchange on the day defendant fixed it, and the price agreed upon on the day the actual delivery was made and the futures bought for defendant by plaintiff.

Such a contract is a gambling contract and is not enforceable under the laws of this state. Revised Civil Code, art. 2983.

A case similar in many respects to the one at bar is that of Burney v. Blanks, decided by the Court of Civil Appeals of Texas, in which a writ of error was denied by the Texas Supreme Court. It is reported in 136 S.W. 806, 809. We quote from the opinion as follows:

"We think it appears from the appellee's own testimony, as well as that given on behalf of appellants, that the defendants sold to the plaintiff 133 bales of cotton at the market price of cotton at the time and place of the sale, and that the parties then and there agreed that, if the same grade of cotton should advance in price between that date and the 30th day of April, following, the defendants would have the right, upon demand, to collect from the plaintiff the difference between the price of such cotton at the time the demand was made, and the price which the plaintiff had paid the defendants for it. And, on the other hand, if no such demand was made by the defendants, and on the 30th day of April the market value of the grade of cotton referred to was less than the amount the plaintiff had paid for it, then he should have the right to collect the difference from the defendants. It is conceded in appellee's brief that the amount paid was the market value of the cotton at that time.

"If this is what the transaction was, we are unable to distinguish it from a bet or wager.

"It is now well settled in this state that gambling contracts will not be enforced by the courts; and before the enactment of our statute making it unlawful to deal in futures it had been decided, in Seeligson v. Lewis, 65 Tex. 215 [57 Am.Rep. 593], that such contracts were contrary to public policy, and not enforceable in the courts. That proposition of law is not controverted by appellee's counsel, but their contention is that the contract sued on, and the transaction covered by it, do not disclose an intention to bet or wager. On the contrary, they contend that it was the intention of the defendants to sell, and of the plaintiff to buy, 133 bales of cotton at a price to be determined by the market value of that grade of cotton at a future time, and that the payment then made by the plaintiff to the defendants, which, it is conceded in appellee's brief, was the market value of the cotton on that day, was not made in full payment for the cotton, but merely as an advance or partial payment. In our opinion, neither the terms of the contract nor the testimony given by the plaintiff support that contention. On the contrary, they show that the cotton was sold and bought at the then existing market price, and that the agreement in reference to future settlements, while made at the same time and in connection with the contract of sale, was not intended to fix the consideration for the sale or the price to be paid for the cotton. There is no ambiguity in the terms of the contract by which the defendants agreed to sell to the plaintiff, and the plaintiff agreed to purchase from the defendants, the cotton for a consideration of 10.80 cents per pound. The contract itself specifically specifies that as the amount of consideration which the plaintiff was to pay for the cotton, and the further stipulations contained in the contract do not in any wise modify the stipulation referred to. The other stipulations securing to each party an option to demand an additional settlement do not prescribe that the amount paid as a result of such settlement shall be any part of the con-

sideration for the cotton. In fact, an additional settlement under the option conferred upon the plaintiff could not result in an additional payment for the cotton, because such payment would be made by the seller to the purchaser, instead of by the purchaser to the seller.

"Nor is it material that the optional feature of the contract was made at the same time and in connection with the contract of sale, and that the thing sold was actually delivered. The law condemns gambling contracts, including those disguised under the forms of legitimate business. 14 Am. & Eng. Ency. Law, pp. 603, 604; 20 Cyc. p. 921. The last volume cited defines a wager as follows:

"'A wager is a contract by which two or more parties agree that a certain sum of money or other thing of value shall be paid or delivered to one of them upon the happening of an uncertain event; it implies that each of the parties shall jeopardize something and have a chance to gain something or to recover the stakes or thing bet or wagered upon the determining of the contingent or uncertain event in his favor, and hence is a form of gambling.'

"In support of the proposition that the fact that the optional features of this contract are connected with the contract of sale, and an actual delivery of the cotton does not legalize its optional feature; we refer to First National Bank v. Carroll, 80 Iowa, 11, 45 N.W. 304, 8 L.R.A. 275. In that case the contract read as follows:

"'Creston, Iowa, December 5, 1888. In consideration of $30 paid to me this day by L. J. Cusick, I hereby guarantee to him that the five cars of cattle shipped by Cusick Bros. on December 3, to Chicago, shall sell in Chicago for 4c. per pound, and he having a one-half interest in said cattle, I agree to make good to him any loss by reason of the said cattle selling for less than 4c. That is, I am to pay him the difference, if any, between the price the cattle sell for and the 4c. on his half interest, in case they sell for less than 4c. Said difference to be paid to him on receipt of account sale, and if said cattle sell for more than 4c., I am to have the difference. C. W. Carroll. I agree to pay C. W. Carroll whatever said cattle sell for over 4c., on my half interest. L. J. Cusick.'

"We also make the following quotation from the opinion of the court in that case:

"'Appellant likens this contract in its purposes and effect to option deals, which are held to be gambling contracts, and void. Appellee, however, urges us as a distinct measure that in option deals there is no actual property as the basis of the transaction, and no property is intended to be delivered or received, while in this case the cattle actually on the way to market formed a basis of the transaction, and it is urged that by the contract the cattle were sold to Carroll, or, at least, an interest therein. We are unable to find any language in the contract evincing such a purpose. Cusick Bros. shipped the cattle; they were to sell the cattle in Chicago, and the contract in question is an executory one, to be performed after the cattle are sold. The transaction was clearly one as to price. The disposition of the cattle is precisely what it had been, had the contract not been made. Cusick Bros. sold the cattle, as they intended to, for what they would bring on the market and received the pay therefor, and this would have been the situation without the contract in question. The parties to the contract dealt alone with what would be the market price when the cattle should arrive in Chicago. The market price represented the actual value of the cattle. If the market price was above the 4 cents per pound and Cusick paid the excess to Carroll, Carroll received something for nothing. If the market price was less, and Carroll paid Cusick the difference, then Cusick received more than the value of his cattle, or, in other words, something for nothing, and such receipts are the spirit and soul of gambling enterprises. Brua's Appeal, 55 Pa. 294, gives the following definition: "Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another is gambling." This transaction was clearly one in which the parties intended to pay the gain or loss as a market price at a future time would require, without intending to deliver property, and under the rule given in the Pennsylvania case (55 Pa. 294) it was a wager. The mere fact that there was specified property about which the transaction occurred would make no defense. Parties may as effectually gamble with reference to actual property as with reference to the prices of different kinds of property. The cases do not turn upon that point, but upon the actual intention of the parties.'

"In appellee's brief it seems to be conceded that in contracts of this character, if the parties have no interest in the future con-

tingency, upon the happening of which one or the other is to be paid a sum of money, other than the interest secured to them by the contract, then such contract is a wager, and not enforceable; but it is contended that, aside from the optional feature of this contract, both parties had an interest in the subsequent value of the thing sold. We are unable to sanction that contention. The cotton having been sold by the defendants to the plaintiff, and he having paid the full consideration therefor, the defendants were not thereafter interested in the value of the cotton. It no longer belonged to them, but to the plaintiff, who had paid the contract price for it. Hence it follows that, after the sale was made and the cotton paid for, only one, and not both, of the parties, had an interest in its subsequent value, except as such interest was created by the optional feature of the contract.

"Upon the whole case, which has been thoroughly developed, our conclusion is that appellees cannot maintain their suit, and therefore the case is reversed and here rendered for appellant.

"Reversed and rendered."

Also see Wolfe v. Andrews (Tex.Civ. App.) 192 S.W. 266.

Wolfe v. Andrews (Tex.Civ.App.) 192 S.W. 266, 267, is almost on all fours with the case at bar. The contract in that case was in writing and is as follows:

"'Dallas, Texas, Dec. 28, 1910.

"'Mr. R. G. Andrews, Winnsboro, Texas.

"'Dear Sir: We confirm purchase from you this day through Mr. Will Rash, Sulphur Springs, Texas, of the following cotton: Sixteen hundred (1,600) bales cotton at 14.39¢, basis middling, based on March New Orleans at 15.14¢, your option of fixing the price during market hours at any time between now and March 1, 1911, by giving notice to us of the time you select to fix the price. It is understood that at the time you select to fix the price if March New Orleans is above 15.14¢ we will pay you the difference, but if March New Orleans is below 15.14¢ you will pay the difference. Please confirm the sale by signing and returning the attached copy of this letter.

"'Yours very truly,

"'M. H. Wolfe & Co., per J. H. H.

"'The above contract is accepted.'"

Under the terms of the above contract, defendant shipped 1,600 bales of cotton to plaintiff and was paid in accordance with said contract. Cotton declined in price and plaintiff, the buyer, as did plaintiff in this case, fixed the price in default of defendant's fixing it, and sued for the difference between that paid for the cotton and the price when fixed. The defense was the same as is made here. The court in its opinion said:

"We have no criticism to make of appellant's proposition as to its being sound as a proposition of law, but we think the contract is subject to construction by the court and is contrary to the law. It shows that the cotton was purchased, and the allegations of the petition show that in pursuance thereof it was delivered, and that so much money was advanced at the price of 14.39 cents basis middling, based on March, New Orleans at 15.14 cents, etc., appellee to have the option of fixing the price at any time before March 1, 1911. While there may be some ambiguity in the terms thus far expressed to the uninformed mind in the cotton trade there is none in the latter clause, which reads:

"'It is understood that at the time you select to fix the price if March New Orleans is above 15.14¢ we will pay you the difference, but if March New Orleans is below 15.14¢ you will pay the difference' —which shows that the difference in the price of cotton was to be fixed at March 1st, New Orleans, and whether or not at that time it was above or below that figure the difference was to be paid to the one or the other. This was uncertain and was not definite as to the price to be paid, and showed that chances were taken as to what the difference would be. The terms of this much of the contract being certain it was the duty of the court to construe it, and not leave any construction to be placed upon it by a jury, as it showed on its face that it was in violation of law. We are of the opinion that the contract relied on is a wagering one and one upon which no recovery can be had. In support of this holding we rely on the case of Burney v. Blanks [Tex.Civ.App.] 136 S.W. 806, in which case a writ was denied by our Supreme Court. The opinion in that case was rendered by the Third Court of Civil Appeals at Austin, and the opinion written by Mr. Chief Justice Key. The principle announced therein, we think clearly in point, and settles this case against appellant."

While the decisions from other states are not necessarily binding upon us, they are most persuasive where there are

no decisions from our own state where a similar state of facts is involved. The reasoning in the above-quoted decisions is sound and we think in accord with the principles laid down in a vast majority of the decisions of most of the states of the Union, including our own.

The lower court rejected the demands of plaintiff without written reasons; therefore, we do not know upon what defense its decision was based. It, however, is in our opinion a correct judgment, and is affirmed, with costs.